**In re the O'DAY CORPORATION, Debtor.**

**Harold B. MURPHY, Chapter 7 Trustee, Plaintiff,**

v.

**MERITOR SAVINGS BANK, Defendant.**

**Bankruptcy No. 89–11136–JNG. Adv. No. A90–1087.**

United States Bankruptcy Court, D. Massachusetts.

April 16, 1991.

As Corrected May 7, 1991.

Daniel J. Lyne, Hanify & King, Boston, Mass., for plaintiff.

Robert Kargen, Lesser & Kaplin, P.C., Blue Bell, Pa., for defendant.

## MEMORANDUM

JAMES N. GABRIEL, Bankruptcy Judge.

### I. PROCEDURAL HISTORY

On April 27, 1989, an involuntary petition for relief under Chapter 7 of the Bankruptcy Code was filed by three creditors against The O'Day Corporation ("O'Day" or the "Debtor"), a manufacturer of fiberglass sailboats located at 848 Airport Road, Fall River, Massachusetts. No responsive pleading was filed by the alleged Debtor, which had ceased all operations prior to the filing. Accordingly, on May 23, 1989, an Order for Relief was entered. Two days later, Harold B. Murphy (the "Trustee") was appointed interim trustee.

On June 1, 1989, Meritor Savings Bank ("Meritor" or the "Bank") filed a Motion for Relief from the Automatic Stay imposed by the Bankruptcy Code. On June 19, 1989, it filed an Amended Motion in which it asserted a perfected security interest in all of O'Day's machinery, equipment, furniture, fixtures, accounts receivable, general intangibles, and other tangible and intangible assets, as well as a mortgage lien on and security interest in the real property and improvements owned by O'Day and located in Fall River. Meritor asserted that the amount of its debt exceeded $8 million.

On June 26, 1989, the Trustee filed an opposition to the Bank's motion. He supplemented his opposition nearly one month later, raising questions about the amount, validity, enforceability, and priority of the Bank's lien based upon his preliminary investigation of the 1987 leveraged buyout ("LBO") that generated the Bank's claim.

Despite the portents of litigation, Meritor and the Trustee recognized that the expeditious disposal of the real and personal property was mutually advantageous. Consequently, on August 22, 1989, they entered into a stipulation, which was approved by the Court on September 9, 1989, that provided for the sale of the real and personal property at public auction. On August 27, 1989, the Trustee filed a Notice of Intended Sale by Public Auction to which an objection was filed by C. Raymond Hunt & Associates. By order dated September 22, 1989, and after notice and a hearing, the Court overruled the Hunt objection and authorized the Trustee to sell all the Debtor's assets.

On September 26 and 27, 1989, the Court appointed auctioneer, Wm. F. Comly & Sons, Inc., conducted the auction sale. The proceeds from the sale were approximately $1.9 million. The intangible assets, including the molds, designs, name and goodwill of O'Day, were sold for $620,000. The real estate was not sold. The proceeds from the sale were placed in an escrow account pending further order of the Court.

On March 19, 1990, two days before the commencement of the evidentiary hearing on Meritor's Amended Motion for Relief from Stay, the Trustee filed a six count, Verified Complaint under the Uniform Fraudulent Conveyance Act ("UFCA") and sections 510 and 548 of the Bankruptcy Code. In brief, the Trustee, through Count I, sought to avoid Meritor's security interests in the collateral, pursuant to section 7 of the UFCA, based upon actual intent to hinder, delay or defraud creditors. Through Counts II and III, the Trustee sought to avoid the Bank's liens, pursuant to sections 4 and 5 of the UFCA, based upon allegations that the LBO rendered O'Day insolvent and left it with insufficient

working capital. Through each of the first three Counts, the Trustee sought to avoid Meritor's liens in their entirety. Through Counts IV and V, the Trustee sought to avoid Meritor's mortgage lien under the UFCA and the Bankruptcy Code, respectively. Finally, through Count VI, the Trustee, pursuant to section 510 of the Bankruptcy Code, sought to equitably subordinate Meritor's claim to that of the unsecured creditors.

With his Verified Complaint, the Trustee also filed a Motion for Temporary Restraining Order and Permanent Injunction, seeking to enjoin the Bank from foreclosing on the real property and the funds escrowed from the sale of the personal property, until the Court ruled on the merits of the complaint.

On March 21, 1990, the Trustee and Meritor executed a second stipulation in which they agreed 1) that the Bank's security interest in the personal property was properly recorded; 2) that a mortgage on the real property of O'Day was recorded on June 16, 1988 to secure Meritor's 1987 loans; 3) that for purposes of the hearing the fair market value of the real estate in Fall River did not exceed $5 million; 4) that the debt owed Meritor as of April 28, 1989 was $8,275,156.02; 5) that for purposes of the hearing the total available proceeds from the sale of assets were projected to be $7 million; 6) that the collateral was not necessary for an effective reorganization; and 7) that there was no equity in the collateral for creditors other than Meritor.

On April 20, 1990, in conjunction with the Trustee's motion for injunctive relief, Meritor and the Trustee filed a third stipulation in which they agreed to the following:

1) that the Trustee would suffer irreparable harm in the event the Court ordered the turnover of any funds or any assets of the estate pending final adjudication of Meritor's Amended Motion for Relief from the Automatic Stay or the claims raised in the Trustee's Verified Complaint;

2) that the harm suffered by the Trustee in the event the injunction did not issue would outweigh any harm suffered by Meritor in the event the injunction did issue; and

3) that the requested injunctive relief was in the public interest.

Because the Trustee and Meritor stipulated to the elements of section 362(d)(2) of the Bankruptcy Code, and because they stipulated to three of the four elements that the Trustee must establish to obtain injunctive relief, the only issue before the Court is whether the Trustee has demonstrated a likelihood of success on the merits of his six count complaint.

On March 21, March 22, April 23, April 24, May 24, June 27 and June 28, 1990, the Court conducted an evidentiary hearing with respect to Meritor's Amended Motion for Relief from Stay and the Trustee's request for injunctive relief. Six witnesses testified and approximately 175 exhibits were introduced into evidence.

## II. FACTS

### A. Pre–LBO Events

George M. O'Day was an outstanding boating enthusiast who started building O'Day "Day Sailers" in Massachusetts in 1959. Because of the quality and workmanship of the Day Sailers, as well as additional models, the O'Day name developed a premier reputation.

In 1966, Bangor Punta Corporation acquired all the assets of the original O'Day company. Several years later, in 1969, it acquired the CAL sailboat line, another prominent name in the sailboat industry. Operating under the name Bangor Punta Marine, Bangor Punta Corporation manufactured and distributed O'Day and CAL auxiliary powered fiberglass sailboats (those with motors) and non-auxiliary powered fiberglass sailboats (those without motors, such as the O'Day Day Sailer).

In 1984, Lear Siegler, Inc. ("LSI"), a publicly held corporation, acquired the O'Day and CAL lines of boats, as well as the Prindle line of day sailing and racing catamarans. The O'Day/Cal sailboats and Prindle catamarans were then manufactured by Lear Siegler Marine, a division of the Lear Siegler Industrial/Recreation

Group at plants in Fall River, Massachusetts, and Santa Ana, California.

Nearly three years later, in February of 1987, an investor group led by the investment banking firm of Forstmann Little & Co. ("Forstmann") acquired all the stock of LSI. The multi-billion .dollar transaction was a leveraged buyout through which LSI was "taken private."

In connection with the transaction, Forstmann created a new company called Lear Siegler Holdings Corp. to acquire the stock of LSI. It also formed other corporate entities to acquire the assets of the companies or divisions formerly owned by LSI, including Lear Siegler Marine. Specifically, on January 13, 1987, Forstmann created three Delaware corporations: B.P. Acquisition Corp. No. 13 (B.P. 13), B.P. Acquisition Corp. No. 14 (B.P. 14), and B.P. Acquisition Corp. No. 15 (B.P. 15). B.P. 13 held all the stock of both B.P. 14 and B.P. 15. B.P. 14 thereafter acquired the assets of the Prindle division, and, similarly, B.P. 15 acquired the assets of the O'Day/Cal division of LSI. On February 10, 1987, all three entities, B.P. 13, B.P. 14, and B.P. 15, changed their names to Bangor Punta Marine Products Corp., Prindle Boats Corp. ("Prindle"), and O'Day/Cal Sail Boats Corp. ("O'Day/Cal"), respectively.

In conjunction with its acquisition of LSI, Forstmann contemplated divestiture of various divisions, including Lear Siegler Marine. Consequently, the transactions outlined above, as well as the marketing of O'Day/Cal and Prindle, were engineered with the assistance of Deloitte Haskins & Sells, as auditors and tax planners for LSI, and Goldman, Sachs & Co. ("Goldman Sachs"), as investment bankers for Lear Siegler Holdings Corp., not to mention various law firms.

In furtherance of the divestiture plan, on February 12, 1987, Winston W. Hutchins, as Corporate Vice–President, executed notes on behalf of O'Day/Cal and Prindle in the principal amounts of $12,916,425 and $1,357,720, respectively. The notes (collectively the "Intercompany Notes") were payable to an entity known as LS Acquisition Corp. (Tr. Ex. 44, Tabs 27, 28).[1]

From February 1987 to June 30, 1987, Forstmann operated O'Day/Cal and Prindle. Simultaneously, Goldman Sachs prepared a private offering memorandum, dated February 1987, and began marketing O'Day/Cal and Prindle.

The Confidential Offering Memorandum (the "Offering Memo") (M. Ex. 1) produced by Goldman Sachs was a 24 page document with numerous attachments that detailed, among other things, the historical and projected financial performance of Lear Siegler Marine. Specifically, an unaudited schedule of operations revealed the following:

| Year[2] | Sales[3] | Gross Profit[4] Margin | EBIT[5] | Income Before Allocations |
|---|---|---|---|---|
| 1982 | 20,992 | 16.19 | 965 | 342 |
| 1983 | 21,149 | 19.18 | 1,454 | 1,315 |
| 1984 | 26,402 | 21.71 | 2,647 | 2,481 |
| 1985 | 19,760 | 15.08 | 554 | (353) |
| 1986 | 22,566 | 21.84 | 2,310 | 2,243 |
| 1987 (estimated) | 24,200 | 22.11 | 2,650 | 2,674 |

1. References to exhibits shall be prefaced by the party introducing it (M stands for Meritor, Tr. for Trustee). References to the transcripts will be by volume number and page prefaced by "Trans."

2. Lear Siegler Marine's fiscal year end was June 30th.

3. All figures in this chart and other charts in this memorandum are in thousands unless otherwise stated.

4. The gross profit margin is a percentage computed by dividing the gross profit by the net sales. It is a measure of a company's profitability.

5. EBIT stands for earnings before interest and taxes. It is sometimes used interchangeably with income from operations.

The gross profit margins for the years 1982–1986 averaged 18.80 percent. If the year 1985 is excluded, the average was 19.75 percent. For the six months ending December 31, 1986, the Offering Memo showed the company to have had net sales of $10,154,000 and gross profits of $1,953,- 000 resulting in a gross profit margin of 19.23 percent.

With respect to the O'Day and Cal product lines, in particular, the Offering Memo revealed the following about the dollar value of sales and the number of units sold:

| | O'Day | | CAL | |
| Year | Dollars | Units | Dollars | Units |
| --- | --- | --- | --- | --- |
| 1982 | 16,858 | 1,301 | 4,134 | 123 |
| 1983 | 15,149 | 1,023 | 6,000 | 177 |
| 1984 | 21,037 | 1,420 | 5,370 | 200 |
| 1985 | 15,149 | 922 | 2,716 | 106 |
| 1986 | 14,882 | 952 | 5,438 | 184 |

Although the Offering Memo noted a "general softness in the sailboat industry" in 1986, it emphasized the company's growth and success in its primary market segment, namely powered sailboats ranging from 27 feet to 40 feet in length. The Offering Memo also boasted of the company's increasing market share and unit sales, its product design capabilities and innovations, its excellent dealer network, seasoned management team, and "experienced and stable" employee base. However, the Offering Memo did note the existence of problems in 1985, including the shutdown of the company's plant in Tampa, Florida that resulted in a temporary loss of capacity; high interest rates; and high energy prices. These problems together caused a 25% decline in sales and a reduction in margins in fiscal 1985.

In early 1987, Meritor became aware of Forstmann's desire to sell O'Day/Cal and Prindle as a result of its involvement in financing Forstmann's acquisition of LSI. Due to its relationship with Lance T. Funston ("Funston"), Meritor also was aware that Funston was engaged in the business of acquiring corporations.[6] Indeed, Kenneth E. Jones ("Jones"), a senior lending officer at Meritor, who testified he had been involved in approximately 10–15 LBO deals in 1986, contacted Funston to inform him about the sale of O'Day/Cal and Prindle stock. Funston arranged to receive a copy of the Goldman Sachs Offering Memo. Shortly afterwards, on February 27, 1987, L.T. Funston & Co., Inc. provided Goldman Sachs with a letter of interest. (M. Ex. 5).

As a result of the letter of interest, Funston and his company were given full access to the books and records of O'Day/Cal and Prindle. He or one of his associates interviewed management and toured the facility in Fall River. In short, he had the opportunity to conduct a thorough investigation of all aspects of the company, financial and otherwise. Funston then began negotiating with Meritor about financing the stock acquisition.

6. In 1985, Meritor hired Funston, who did business as L.T. Funston & Co., Inc., to develop an LBO financing package and locate LBO deals as part of its transition from a regional, middle market secured lender to a national lender concentrating in the LBO field. Funston developed a subordinated debt vehicle for Meritor known by the acronym DIAL, which stands for Deferred Interest Acquisition Loan. Meritor agreed to pay Funston fees when DIAL loans were used. In 1986 and 1987, Meritor closed on LBO related loans of over $1 billion. (Trans. Vol. I, pp. 121–27).

At Jones' request, Funston prepared projections or sensitivity analyses, based upon the historical operating information supplied by Goldman Sachs as modified by estimates of the company's performance. These projections were attached to a Credit Memorandum (the "Credit Memo"), dated April 24, 1987, that Jones prepared and submitted to Meritor's Senior Loan Committee (M. Ex. 36). Like Funston, Meritor's personnel had full access to the company's books and records. Meritor's personnel also communicated with management and toured the physical plant.

According to Jones, the April 24, 1987 Credit Memo was based upon interviews with management, the Goldman Sachs Offering Memo, industry sources, and general economic data. Jones sought approval for the following loans:

1. $2,500,000 Asset–Based, seven year Revolving Credit with advances not to exceed 80% of eligible receivables and 50% of eligible inventory, with some level of inventory cap;

2. $7,200,000 Term Loan to mature seven years from Closing;

3. $400,000 Six month Bridge Loan, pending the sale of the Prindle division;

4. $500,000 Subordinated Debt.

Jones anticipated that the collateral to secure the loan would be "[a]ll the assets of the Company, including real estate, inventory, receivables, trademarks, and patents." He estimated the "market value" of the various assets at closing as follows:

| | Value | | Loan Value |
| --- | --- | --- | --- |
| Accounts Receivable | $ 800 | 80% | $ 640 |
| Inventory | $3,500 | 50 | $1,750 |
| Machinery and Equipment | Minimal | | 200 |
| Real Estate | $5,500 | 80 | $4,400 |

During the trial he testified more precisely that the loan values represented orderly liquidation values. (Trans. Vol. I, p. 159). Jones' Credit Memo was predicated upon the sale of the Prindle line which was unprofitable. Jones anticipated a sales price between $400,000 and $800,000 for that division.

Jones discussed two distinct market trends in his Credit Memo: 1) an overall decline in unit sales; and 2) a shift in demand from smaller boats to larger, more expensive ones. He noted that Lear Siegler Marine had maintained its sales levels in a tough market, despite adverse trends. In addition, based upon conversations with industry experts, he opined that "the industry has hit bottom and should remain stable over the foreseeable future." He concluded that Lear Siegler Marine would generate adequate sales volume due to improved market conditions, product positioning, new products, reputation, and consistency.

In the Projected Financial Analysis section of his Credit Memo, Jones described two ways to evaluate future cash flow: flat EBIT (EBIT, as has been mentioned, is an acronym for earnings before interest and taxes) and reduced sales. With respect to the former scenario, Jones and Funston assumed a flat $2 million EBIT. Using that scenario, which Jones and Funston testified was the "most likely" scenario, Jones averred in the Credit Memo that the term loan of $7.2 million would be completely paid off in the seventh year, with the revolver at $1.8 million. With respect to the reduced sales or, as Jones and Funston testified, "the worst case" scenario, they employed the 1986 average price for boats sold ($17,877) and the average number of boats sold during the five years preceding the 1986 fiscal year (1,260) to derive a sales level of $22.5 million, which they discounted by 10% "to allow for future deterioration in the industry." Under the reduced sales scenario, EBIT for the years 1988 through 1994 was projected to be $1,975 million and the gross profit margin was projected to be 21.84 percent.

Jones indicated that under the reduced sales scenario, the term loan would be completely paid off in the seventh year with the revolver standing at $1.7 million.

Jones stated:

The largest part of debt repayment in the first year is cash from the shrinking of working capital. This contributes about $1,000,000 during fiscal 1988. It is our experience that with spin-offs from conglomerates like Lear Siegler, these now private companies can better manage inventories, stretch payables, and accelerate receivables. O'Day is envisioning that inventory will turn three days faster; receivables will stay an already excellent 16 days (most dealers pay C.O.D. or floor-plan the boats), and stretch payables an additional 13 days to 45 days. All of these numbers are reasonable. The [sic]

All in all, the projections used to make this loan decision are reasonable and attainable.[7]

Jones acknowledged negative aspects of the contemplated transaction. He identified five risks associated with the proposed loan, including a collateral coverage risk. Specifically, Jones determined that collateral coverage during the first two years after the LBO would be insufficient to repay senior bank debt. However, he noted, as mitigating factors, the value of the O'Day and CAL trademarks to other boat builders, the steadiness of Lear Siegler Marine's cash flow which would offset the $2.7 million collateral coverage shortfall, and the sale of the Prindle line, which would garner cash. The other four risks identified by Jones were 1) an industry risk associated with the decline in the number of units sold, which decline might affect EBIT and Lear Siegler Marines' ability to service debt; 2) a management risk since existing management was not accustomed to running a private company "where cash is king, and there is no bottomless pit to draw resources;" 3) an interest rate risk; and 4) a product liability risk. Despite the risks, Jones recommended the financing package.

Six days after the submission of the Credit Memo, L.T. Funston & Co., Inc. submitted a preemptive bid for the stock of O'Day/Cal and Prindle for $14,275,000. (M. Ex. 5). This sum, according to the April 30, 1987 proposal, "represented the purchase of [intercompany] notes ($1,357,-720 and $12,916,425) at par and purchase of the Stock for $855." The bid also assumed an adjustment to the purchase price to the extent that operating earnings for fiscal year 1987, which were projected in the Offering Memo to be $2,650,000, were below $2.6 million. Notably, the price offered by Funston was within the $14–$17 million range that Goldman Sachs anticipated as a selling price. On May 7, 1987, Meritor issued a commitment letter to Funston (Tr. Ex. 12). An Agreement of Purchase and Sale between Bangor Punta Marine Products Corp. and LTF Acquisition Corp. was executed on June 8, 1987. (Tr. Ex. 44, Tab 1).

Prior to the execution of the Agreement of Purchase and Sale, Goldman Sachs was in contact with several other potential purchasers. Michael Dahill ("Dahill"), the President of O'Day/Cal and Prindle headed one group of potential purchasers. Although the management group headed by Dahill had financing available, Dahill testified that the transaction contemplated by Funston involved more equity and less risk than the one he and his associates contemplated. Indeed, Dahill and two other managers, Brad Turner and William Bouchard, eventually joined forces with Funston to acquire the O'Day/Cal and Prindle stock.

The structure of the acquisition involved the formation of LTF Acquisition Corp. The acquisition price was to be $13,915,000, not the $14,275,000 set forth in the preemptive bid. The price was to be subject to certain adjustments, including a dollar-for-dollar adjustment in the event that the fourth quarter earnings before interest and taxes were less than $894,000. The provision in the purchase and sale agreement that incorporated this adjustment was known as the "Clawback."

7. A line or lines was excised from this para-

graph in the exhibit submitted to the Court.

The amount of equity invested was to be $2,450,000. Of that amount, Equus Investments I, Limited Partnership ("Equus") was to contribute $2,250,000; Funston was to contribute $80,000; Dahill was to invest $60,000, and Turner and Bouchard each would contribute $30,000.

LTF Acquisition Corp., O'Day/Cal, and Prindle jointly and severally contemplated borrowing the balance of the acquisition price from Meritor, which amount was to be secured by a security interest in all the real and personal property owned by O'Day/Cal and Prindle. After the loan was granted, the loan proceeds plus a portion of the equity were to be wire transferred to Bangor Punta's bank. LTF Acquisition Corp. and O'Day/Cal were to merge at that time. LTF Acquisition Corp. was to be the surviving entity and was to change its name to The O'Day Corporation. Prindle Boats Corp. was to become a wholly owned subsidiary of O'Day. The cancellation of the Intercompany Notes executed on February 12, 1987 also was a condition of the transaction. A closing was scheduled for June 30, 1987.

In late June, prior to the closing, Arthur Andersen & Co. ("Arthur Andersen") submitted to Funston unaudited financial information, which reflected actual financial results of operations for O'Day/Cal and Prindle through March 31, 1987. (M. Ex. 25). Arthur Andersen's review of the combined balance sheets of O'Day/Cal and Prindle, and the related combined statement of income for the nine months ending March 31, 1987, however, was not the equivalent of an audit conducted in accordance with generally accepted auditing standards. Nevertheless, the balance sheet as of March 31, 1987 revealed the following:

### Assets

CURRENT ASSETS:

| | |
|---|---:|
| Accounts receivable, net of allowances for bad debts of $106 and $95 at March 31, 1987 and June 30, 1986, respectively | $1,706 |
| Inventories | 3,830 |
| Other current assets | 147 |
| Total | $5,683 |
| PROPERTY, PLANT AND EQUIPMENT | $5,802 |
| Less—Accumulated depreciation | 3,129 |
| Net property, plant and equipment | $2,673 |
| NOTE RECEIVABLE | $ 200 |
| OTHER ASSETS | 247 |
| | $8,803 |

### Liabilities and Equity

CURRENT LIABILITIES:

| | |
|---|---:|
| Current maturities of long-term debt | $ 78 |
| Accounts payable | 1,490 |
| Accrued liabilities | 1,250 |
| Total | $2,818 |
| LONG–TERM DEBT, net of current maturities | $ 224 |
| EQUITY | $5,761 |
| | $8,803 |

$8,803

Notably, the balance sheet did not include any reference to the February 12, 1987 Intercompany Notes executed by O'Day/Cal and Prindle in favor of LS Acquisition Corp. Likewise, the balance sheets, dated March 31, 1987 and April 30, 1987, which were transmitted to Funston on May 16, 1987 by Goldman Sachs (M. Ex. 21) did not reveal the Intercompany Notes. However, in a separate letter dated April 24, 1987 (M. Ex. 8), in a telecopy dated April 28, 1987 (M. Ex. 20) and in a fax dated June 2, 1987 (M. Ex. 23), Funston received a March 31, 1987 balance sheet showing the Intercompany Notes. In particular, the balance sheet contained in the April 28, 1987 telecopy showed long term debt of $14,498,000. It also included, as an asset, an item designated "Excess Purchase Cost to be Allocated" in the amount of $16,461,000.

The unaudited combined statement of income for the nine months ending March 31, 1987 (M. Ex. 25) revealed the following:

| | |
|---|---:|
| NET SALES | $16,898 |
| COST OF SALES | 13,709 |
| Gross profit | $3,189 |
| OPERATING EXPENSES: | |
| Sales and advertising | $ 1,113 |
| General and administrative | 730 |
| Total | $ 1,843 |
| Operating income | $ 1,346 |
| OTHER INCOME, net | 15 |
| Income | $ 1,361 |
| EQUITY, June 30, 1986 | 4,664 |
| UNLOCATED DIFFERENCE | (264) |
| EQUITY, March 31, 1987 | $ 5,761 |

---

This income statement for the period ending March 31, 1987 showed a decline in the gross profit margin from the 19.23 percent for the period ending December 31, 1986 (M. Ex. 1) to 18.87 percent for the third quarter of the 1987 fiscal year.

In performing their review of the proposed LBO, both Funston and Jones testified that they relied heavily upon the financial projections included in the Offering Memo and the third quarter interim financials, which were prepared by Deloitte Haskins & Sells and reviewed by Arthur Andersen. However, in addition to the balance sheets, statements of operation and projections available from Goldman Sachs, there was information available to Funston and the Bank in the files of the company, including Controller's Letters and long range planning materials (Tr. Ex. 1 and M. Ex. 50), all of which highlight the general cyclical nature of the industry and the company's earnings. For example, in a document summarizing the business environment of Lear Siegler Marine, the company projected low growth and continued consolidation for the industry. The company further identified economic cyclicality, foreign competition, and the value of the U.S. dollar as industry risks. Indeed, that document states that "[t]he major risks for the sailboating industry and Lear Siegler Marine are economic. Sailboats are part of

the global leisure industry, and, therefore, are affected by economic cycles." In a similar vein, a statement, which prefaced a document captioned "Long Range Planning 1987–1989," characterized the business environment as follows:

Fiberglass sailboats virtually do not wear out, so to remain competitive and successful, new and more innovative products must be developed in order to entice the customer to buy. The used market continues to see a serious price erosion which is a very recent phenomenon.

\* \* \* \* \* \*

Entry costs and returns have been historically low, but financial pressures, increased marketing costs, and the recent decline of product-life cycles will continue to force consolidations and elimination of many companies.

\* \* \* \* \* \*

Participation in sailing has been on the increase since the 1950's ... Conversely, since 1982 the industry data shows a serious unit sales decline, with the worst erosion in the history of the industry occurring since the spring of 1984.

In summarizing the long term outlook, the plan stated that "[t]he current downward trend being experienced by the sailboat industry during a positive economic period makes it difficult to look into the future with confidence." Additionally, the company, in a "Market Business Audit" dated January 1986 that was attached to the long range planning materials, identified the following threats: "inadequate understanding of market and how to significantly effect [sic] it;" and a "higher area employment rate and factory working conditions have reduced available labor pool."

Not only was the boating industry linked to large economic cycles, the company experienced annual cycles with respect to cash flow as well. Specifically, the company experienced a need for cash during the fall and winter months since the vast majority of sales took place in the spring and summer months.

Each month, Victor Gonsalves ("Gonsalves"), the company's Controller, prepared monthly Controller's Letters. Each Letter contained financial data and observations presented in the following format: statistical highlights for month and year to date, net sales analysis by product line, analysis of net earning by product line, reconciliation of actual pre-tax earnings to forecast, analysis of operating expense, analysis of income tax provision, analysis of accounts receivable, analysis of inventories, analysis of days payable outstanding, analysis of cash flow, analysis of short term forecast, and analysis of number of employees.

In the January Controller's Letter (Tr. Ex. 27), Gonsalves reported net sales of $2,003,000, $142,000 above the forecast for the month; net earnings of $43,000, $26,-000 below the forecast for the month; days payable outstanding of 23 and a negative cash flow of $204,000. He noted that "lower direct labor efficiency (due to new labor) continues to effect overhead applied and the unfavorable D.L. [direct labor] variance. Higher material prices over standard, on a few high volume components, contributed to the unfavorable purchase price variance." He also pointed out that the company had made an effort to take all 2% cash discounts, which reduced payables.

Gonsalves, in his February Controller's Letter (Tr. Ex. 28), reported net sales of $1,656,000, $380,000 less than forecasted for the month; net earnings of $57,000, $17,000 below the forecasted amount for the month; days payable outstanding of 18, and a negative cash flow of $105,000. Gonsalves attributed the unfavorable variance in earnings to the decrease in sales and an unfavorable overhead variance. He noted higher prices for lead and cushions, as well as lower direct labor efficiency due to new labor and new product.

In the March 1987 Controller's Letter (Tr. Ex. 29), Gonsalves reported net sales of $3,085,000, $215,000 better than the forecast, net earnings of $154,000, $55,000 below forecast; days payable outstanding of 21; and a positive cash flow of $887,000. Gonsalves complained, however, that high manufacturing variances continued to be a

major problem. He also observed that higher prices for cushions, lead and sails continued to affect purchase price variance.

On May 6, 1987, Gonsalves prepared the April Controller's Letter. (Tr. Ex. 30). He reported net sales of $2,297,000, $237,000 below forecast; net earnings of $128,000, $60,000 below the forecast for the month, days payable outstanding of 25; and a positive cash flow of $998,000. Gonsalves observed that the retention and training of new employees continued to be a problem, creating unfavorable labor and overhead variances. He also stated that prices on major components were continuing to rise, citing the increase in the cost of lead by five cents per pound during the month.

Because Gonsalves prepared the June Controller's Letter on July 13, 1987, the last Controller's Letter that would have been available to Funston or Jones was the May Letter dated June 5, 1987. (Tr. Ex. 31). In that Letter, Gonsalves reported net sales of $2,019,000, $291,000 below the forecast; net earnings of $83,000, $55,000 below the forecast; days payable outstanding of 26; and a positive cash flow of $621,000, well above the forecast. Gonsalves stated that "[m]anufacturing delays due to lack of skilled manpower had a major impact on shipment of product from Fall River." He also stated that "[o]ver the past month, we have seen raw material prices increase substantially, ranging from 4% to 52% on major commodities (resin 20%, fiberglass 5%, engines 11% to 38%, lead 52%). Echoing Gonslaves' report, in a statement of operations addressed to the corporate headquarters, the Senior Vice-President and General Manager of Lear Siegler Marine, Bernard Gleason, noted that "[t]here has been a distinct lack of interest at the retail level on all brands of sailboats, and the dealer network can see no reason for the apparent lack of consumer demand." He then reported that due to significant increases in the prices of raw materials, the company would be forced into a major price increase on August 1, 1987.

Notwithstanding the availability of current information about the company's financial performance, neither Funston nor Meritor took steps to revise the reduced sales scenario projections, which implicitly assumed a gross profit margin of 21.84 percent. The projections were not modified even though the Controller's Letters, the four and five year average gross profit margins (i.e., 19.73 percent and 18.80 percent, respectively), and the March 31, 1987 operating results documented a general financial decline, as well as a decline in the gross profit margin from 19.23 percent to 18.87 percent.

## B. The LBO

The closing of the acquisition occurred on schedule on June 30, 1987. On that day, LS Acquisition Corp. assigned the Intercompany Notes to O'Day/Cal and Prindle. The Intercompany Notes, in turn, were cancelled by O'Day/Cal and Prindle. (Tr. Ex. 44, Tabs 27, 28). Additionally, Meritor provided the following credit facilities:

1. A term loan secured by all assets in the amount of $7,200,000 payable in incremental quarterly installments ranging from $87,500 to $250,000 with a final installment of $1,450,000 in June 1994, plus interest payable monthly at 4.5% above a specified treasury securities yield rate, and deferred interest payable on June 30, 1994 at 1.01% of the company's annual sales beginning with the fiscal year ended July 1, 1989;

2. A revolving line of credit secured by all assets in the amount of $2,500,000 with availability based upon 80% of eligible accounts receivable and 50% of acceptable inventory (up to a maximum of $2,000,000), due on June 30, 1994, with interest payable monthly at 2.75% above Meritor's base rate ($1,871,411.10 was advanced at the closing);

3. A deferred interest acquisition loan secured by all assets in the amount of $500,000 due on June 30, 1994, plus interest payable monthly at 13% and deferred interest payable on June 30, 1994 at 0.87% of the company's annual sales beginning with the fiscal year ended July 1, 1989;

4. An irrevocable letter of credit in the amount of $400,000, which reduced the amount available under the line of credit

to secure a potential tax liability of the selling shareholders.

Not counting the letter of credit, the Meritor loan facilities generated $9,571,411.10. Funston, management and Equus Investments contributed $2,450,000. From those sums, $12,066,000 was paid to Bangor Punta Marine Products Corp.[8] The O'Day Corporation received $235,000 from which it paid $233,656.04 in fees (Tr. Ex. 5), as follows:

| | |
|---|---|
| 1) Meritor legal fees | $ 33,000.00 |
| 2) TWT Consultants, Inc. (Re: Due Diligence Acquisition Management) | $ 18,476.65 |
| 3) L.T. Funston & Co., Inc. for closing fee | $ 60,000.00 |
| 4) L.T. Funston & Co., Inc. for management fee | $ 80,000.00 |
| 5) L.T. Funston & Co., Inc. for expenses, including Meritor financing commitment fee of $25,250 | $ 42,179.39 |
| | $233,656.04 |

---

In the end, O'Day was left with $1,343.96 in cash, and the balance of the money, approximately $120,000, went to Meritor. (In an undated letter, John Freal ("Freal"), a Bank officer who worked with Jones, advised Funston that the amount of fees due Meritor at closing would be $119,-263.88).

Prior to, and as of the date of the LBO closing, there existed a number of claims against Lear Siegler Marine and Bangor Punta Marine, including those of Norman Silk, a tort claimant, (Tr. Ex. 44, Tab 1, Exhibit 2.09(a)), and Cannons Engineering Corp. (Tr. Ex. 44, Tab 1, Exhibit 2.10) (hazardous waste liability for two sites of which one was the Re–Solve site). (M. Ex. 71). The Silk claim, the Re–Solve claims, and the Cannons Engineering Corp. claims are still pending (Trans. Vol. II, pp. 12–15), and proofs of claims have been filed in this case by each of the claimants.

A comparison of the balance sheet of the company before and after the LBO closing made by Douglas Voiland ("Voiland"), the Trustee's expert, a Certified Public Accountant, (Tr. Ex. 47) reveals the following:

### BALANCE SHEET
### June 30, 1987

| | Internal Year End 6/30/87 | Actual AA & Co. Opening 6/30/87 |
|---|---|---|
| Cash | $ 7 | $ 856 |
| Accounts receivable, net | 615 | 535 |
| Inventories FIFO | 3,528 | 3,101 |
| Other current assets | 173 | 276 |
| Total current assets | 4,323 | 4,768 |
| P, P & E, net | 2,829 | 6,252 |
| Intangibles, net | 271 | 6,549 |
| TOTAL ASSETS | 7,423 | 17,569 |

**8.** The closing binder for the June 30, 1987 transaction (Tr. Ex. 44, Tab 29) contains a receipt for $11,666,000. When the $400,000 letter of credit is added to that sum the total is $12,066,000.

| | | |
|---|---|---|
| MERITOR revolver (credit line) | $ 0 | $ 1,870 |
| IRB—current | 81 | 262 |
| MERITOR term loan current | 0 | 600 |
| Accounts payable | 1,344 | 1,259 |
| Accounts liabilities | 1,479 | 2,959 |
| Total current liabilities | 2,904 | 6,950 |
| IRB | 182 | 0 |
| MERITOR letter of credit | 0 | 0 |
| MERITOR term loan | 0 | 6,600 |
| MERITOR subordinated loan | 0 | 500 |
| Total long-term debt | 182 | 7,100 |
| Deferred income taxes | 0 | 1,069 |
| Equity (capital deficiency) | 4,337 | 2,450 |
| TOTAL LIABILITIES AND EQUITY | $7,423 | $17,569 |

The actual internal closing balance sheet was prepared by Deloitte Haskins & Sells. It shows a healthy company with minimal long term debt, and $1,419,000 of working capital, which is defined as the difference between current assets and current liabilities. (Trans. Vol. I, p. 113).

The opening balance sheet was prepared by Voiland using the work papers generated by Arthur Andersen in connection with the preparation of audited financial statements as of July 2, 1988. The Arthur Andersen balance sheet reflects all adjustments related to the purchase price settlement (the Clawback) and the sale of the Prindle line, although O'Day did not receive either the Clawback, i.e., approximately $948,000, (Tr. Ex. 46) or proceeds from the sale of Prindle, i.e., $470,000, until April of 1988. (Tr. Ex. 46). Parenthetically, Gonsalves, in contrast, indicated in a Controller's Letter that O'Day received $622,658 from the settlement and $400,000 from the sale of Prindle assets. (M. Ex. 28).

Meritor's expert, Elmer Heupel ("Heupel"), a Certified Public Accountant and Certified Fraud Examiner, had no particular quarrel with the balance sheet prepared by Voiland from the Arthur Andersen work papers, even though that balance sheet shows a company with substantial long and short term debt and no working capital.

Although both Deloitte Haskins & Sells and Arthur Andersen assigned value to the Debtor's real property and intangibles, prior to, *and as of the date of closing*, O'Day did not own the real estate or the trademarks of O'Day, CAL and Prindle. Bangor Punta Corporation owned the trademarks of O'Day and CAL (Tr. Ex. 45, Tab 41), and Surfglas Incorporated was the owner of the Prindle patents and trademarks. (Tr. Ex. 45, Tab 42). Neither Bangor Punta Corporation nor Surfglas Incorporated was a party to the Agreement of Purchase and Sale between Bangor Punta Marine Products Corp. and LTF Acquisition Corp. (Tr. Ex. 44, Tab 1) or the Loan and Security Agreement between LTF Acquisition Corp., The O'Day Corporation, O'Day/Cal Sailboats Corp., Prindle Boats Corp. and Meritor Savings Bank. (Tr. Ex. 45, Tab 30).

By assignment dated September 23, 1987 (*post*-LBO), Bangor Punta Corporation assigned to O'Day its right, title, and interest in the O'Day and CAL trademarks, together with the associated goodwill. (Tr. Ex.

45, Tab 41). Likewise, on October 5, 1987, Surfglas Incorporated assigned to O'Day its right, title, and interest in the Prindle patent and trademarks, together with the associated goodwill. (Tr. Ex. 45, Tab 42). Approximately one month later, on November 3, 1987, O'Day assigned the Prindle patent and trademarks to Prindle. (Tr. Ex. 45, Tab 42). These assignments were recorded at the Patent and Trademark Office on November 13, 1987. (M. Ex. 64; Tr. Ex. 17).

With respect to the real estate, Meritor ultimately obtained a mortgage on two separate parcels of land: a large lot (Lot 4 on which the manufacturing plant was located) and a smaller adjacent lot (Lot 29). (M. Ex. 66). The existence of Lot 29 was not discovered by either O'Day or the Bank until months after the LBO closing (Trans. Vol. I, p. 186).

The City of Fall River owned the large parcel of real estate under an Industrial Revenue Bond ("IRB") and leased it to The O'Day Company, a Division of Bangor Punta Operations, Inc. (M. Ex. 66; Tr. Ex. 44, Tab 1, Schedule 2.06). The Lease was executed on May 1, 1970. (M. Ex. 66; Tr. Ex. 44, Tab 1, Schedule 2.06). At the time of the LBO closing on June 30, 1987, there was no entity known as The O'Day Company, a Division of Bangor Punta Operations, Inc.

Bangor Punta Operations, Inc., which merged into Bangor Punta Corporation on January 1, 1979 (Tr. Ex. 44, Tab 11), eventually transferred all of its assets to B.P. 15 which ultimately became The O'Day Corporation. (Tr. Ex. 44, Tab 18). Although LSI, the corporate successor to Bangor Punta Operations, Inc., was alleged to have transferred all of its rights under the IRB Lease to The O'Day Corporation (Tr. Ex. 44, Tab 9), the leasehold assignment was never recorded at the appropriate land court or on the Certificate of Title. Therefore, no third party received or could receive proper notice of the assignment or of any prior alleged assignments of the original leasehold interest by Bangor Punta Operations, Inc. to Bangor Punta Corpora-

tion or from Bangor Punta Corporation to LSI. (M. Ex. 66).

As a consequence, the Bank required O'Day to execute a Leasehold Mortgage (although it was not the Lessee) purporting to convey O'Day's leasehold interest in that parcel of land subject to the lease with the City of Fall River. (Tr. Ex. 45, Tab 44). That Leasehold Mortgage, though dated July 1, 1987, was apparently executed on August 13, 1987, as evidenced by the notarization. However, the Leasehold Mortgage was never recorded at the Bristol County Land Court or Registry of Deeds as an encumbrance on the property. (M. Ex. 66).

With respect to the second smaller parcel, as of June 30, 1987, Rapistan Corporation held title to the property. (Tr. Ex. 48, 49). Rapistan transferred its right, title and interest in this parcel to O'Day in April of 1988. (Tr. Ex. 48, 49). On June 16, 1988, Meritor recorded a $10,600,000 mortgage on both parcels.

C. Post–LBO Events

Immediately following the LBO, O'Day's availability under the revolver was approximately $80,000. (Trans. Vol. II, p. 74). Gonsalves testified that accounts payable ranged from $400–$800,000 per month; payroll was approximately $220,000 per month for hourly employees and approximately $110,000 per month for salaried employees. Gonsalves indicated that when he questioned Freal about how O'Day was going to meet these and other expenses he was told to "be creative," a statement he interpreted to mean "hold off paying [vendors]." (Trans. Vol. II, pp. 74–80).

On July 16, 1987, Gonsalves prepared a memorandum which was sent to all of O'Day's vendors and suppliers. (Tr. Ex. 36). In the memo, he stated:

The O'Day Corporation has entered into another phase of its life, a phase which is not new to its history. Purchased through a leveraged buyout, The O'Day Corporation stands alone as its own entity, not part of a larger corporation.

With this exciting prospect comes stability and change. One change, which ef-

fects [sic] you, our vendors, is our payment policy. We have been required by our bankers, Meritor Financial Markets of Philadelphia, to extend some of our payment schedules. This extension, we feel, will be on a temporary basis as we move into our first year of the new O'Day Corporation.

We have a seasoned management team and the backing of an 18.4 billion dollar Philadelphia-based financial operation. With the combination of these two ingredients, along with our products, the future is bright.

With respect to Gonsalves' reference to payment schedules, between July of 1986 and June of 1987 (pre-LBO), the number of days the accounts payable remained outstanding averaged 23 days. That is, prior to the LBO, O'Day's trade creditors usually received payments on their invoices within 23 days. During the 12 months following the LBO, the number of days the payables remained outstanding rose steadily to 75 days and then decreased somewhat after March of 1988. However, the average number of days the payables were outstanding was 57, 12 more than anticipated by Meritor in its Credit Memo (M. Ex. 36) and more than double the preceding fiscal year's average.

Shortly after Gonsalves issued his July 16, 1987 letter to creditors, a Funston associate, in a memorandum regarding post-closing "clean-up" dated July 24, 1987, identified a problem with section 2.20(A) in the Loan and Security Agreement. (Tr. Ex. 42, 45, Tab 30). The loan agreement provided that certain portions of any excess cash received by the company during a given fiscal year beginning with the fiscal year ending June 30, 1988 had to be paid to Meritor. The payments were to be applied in inverse order of maturity against principal under the term loan. Recognizing the seasonality of O'Day's business (a cash surplus was built up during the summer for use during lean winter months), the author of the memorandum observed:

[the excess cash provision] would operate in such a way as to drain all of that surplus out of the company just as it goes into the fall/winter season. Because it is applied to the payment of the latter [sic] maturities of the term loan, and not to the revolver, these surpluses would not thereafter be available to the company during its lean winter months. It does not help to apply these excess cash payments to the revolver because at that stage of the summer season, the revolver would long have been paid down as the company moved into its cash surplus position in the first place. Nonetheless it would appear certain that without some relief from this provision, the company runs the risk of a natural liquidity crunch which it would not otherwise have.

Meritor was made aware of this problem.

In December of 1987, 3I Capital Corporation ("3I") infused $500,000 in new equity into the company. The money, according to Gonsalves in the December Controller's Letter, "was used to lower payables and fund January 1 interest and principal payments at [sic] Meritor." Indeed, Jones testified that Meritor was concerned about its collateral shortfall at that time and wanted to put as much debt as possible against the company's current assets.

By letter dated February 2, 1988, (Tr. Ex. 18), Freal wrote to Funston about funds that O'Day would be receiving (or had received) from 3I, the Prindle sale and the Clawback. He indicated that although $500,000 would be applied to the revolver, the timing of the application of funds was not finalized. He proposed that funds from the sale of Prindle be applied to the revolver, in order to give the company some relief on its working capital needs, and that proceeds from the Clawback be used to curtail the term loan by $500,000, with each of the next twelve quarterly principal payments reduced by $41,666.

As has been mentioned, O'Day sold the assets to Prindle in April of 1988 for $400,-000. Pursuant to the excess cash provision of the Loan and Security Agreement, the proceeds were to be applied to principal payments under the term note. However, they were applied to the revolver instead. (Tr. Ex. 23). Additionally, the Clawback monies were used to reduce the principal of

the term loan and were applied in a fashion agreed to by Funston and Freal. (Tr. Ex. 20).

On January 22, 1988, Greg Marsicano ("Marsicano"), a field examiner for Meritor, prepared an audit summary. (M. Ex. 41). He presented the following comparative analysis of the profit and loss statements for the four months ending October 31, 1987 and October 31, 1986:

| | 1987 | 1986 | $ Change | % Change |
|---|---|---|---|---|
| Net sales | $6,627 | $6,985 | ($358) | (5%) |
| Gross Profit | $1,281 | $1,376 | ($ 95) | (7%) |
| Gross Profit % | 19% | 20% | — | (1%) |
| Net Income | ($396) | $ 180 | ($576) | (320%) |

Marsicano attributed the net loss to decreased sales volume, increased standard cost of material, and interest expense of $468,000, which did not occur in the same period of the prior year. He also noted contingent liabilities totalled $1 million. However, he observed that the company was properly reporting its financial condition.

In May of 1988, L.T. Funston & Company, Inc., on behalf of O'Day, formally requested the restructuring of the DIAL loan. In June, Meritor recorded its $10.6 million mortgage encumbering all of O'Day's real property.

A week after Meritor recorded its mortgage, the Board of Directors of O'Day held a directors' meeting at which the board voted 1) to review the fiscal 1989 budget and present a new budget by July 12, 1988 incorporating changes necessary to operate profitably at an $18 million sales level; 2) to sell the note on the former Tampa facility with Meritor approval; 3) to sell five acres of land with Meritor approval; and 4) to "instruct LTF & Co. to begin negotiations to refinance the long-term debt of The O'Day Corporation with the goal of developing more working capital." (Tr. Ex. 33).

During the following month, Marsicano prepared another audit summary (M. Ex. 47) for the period ending May 31, 1988. His analysis of the profit and loss statements for the 11 months ending May 31, 1988 and May 31, 1987 revealed the following:

| | 5/31/88 | 5/31/87 | $ Change | % Change |
|---|---|---|---|---|
| Net Sales | $18,074 | $18,815 | ($741) | (4%) |
| Gross Profit | $ 2,774 | $ 3,613 | ($839) | (23%) |
| Net Income (Loss) | ($346) | $ 790 | ($1,136) | (144%) |

The gross profit margins were 15.35% and 19.20% for the 1988 and 1987 periods, respectively.

In view of O'Day's financial position, Jones and Freal, in a Credit Memorandum dated August 11, 1988 (M. Ex. 44), proposed "a short term fix to buy time until either the credit is moved or the company can obtain additional working capital." Specifically, they recommended to their superiors three concessions with respect to the Loan and Security Agreement: 1) permitting the sale of the excess five acres of land at the company's plant and dividing the proceeds between the term loan and the revolving credit; 2) reducing the term loan to $4,160,000, or 80% of the appraised value and amortizing it on a 20 year schedule with final maturity shortened by one year to July 1, 1993; and 3) changing the interest rate on the term loan to Meritor's Base Rate plus 2% when it became fully collat-

eralized. Jones and Freal itemized various conditions for the granting of the concessions, including the infusion of $500,000 in either subordinated debt or equity to supply working capital if the loans were not moved by October 21, 1988.

In the August 1988 Credit Memorandum, Jones and Freal observed that O'Day encountered numerous difficulties that culminated in a cash crunch in the summer months. They identified production problems that had caused significant backlogs and a sales problem due to a very strong used fiberglass boat market. Significantly, they identified O'Day's most serious problem as high employee turnover caused by the low unemployment rate in Massachusetts, a problem noted by company personnel as early as January 1986 and documented by Gonsalves in the months preceding the LBO. They concluded that since the company was short anywhere from 15 to 20 production workers at any one point in time, "the entire manufacturing process needs to be overhauled as it is unable to produce efficiently or effectively in the employee short environment."

On August 29, 1988, the Board of Directors discussed the need for a minimum of $500,000 of additional working capital. A proposal was made to increase this amount to $750,000. The Board also discussed refinancing efforts.

On September 20, 1988, Meritor informed O'Day that, as of June 30, 1987, it waived defaults under the Current Ratio, Interest Coverage Ratio and Net Working Capital Covenants "without prejudice as to later events." Arthur Andersen received a copy of the letter. (Tr. Ex. 22). In its audit for the period June 30, 1987 through July 2, 1988 (M. Ex. 42), which was submitted to the stockholders of O'Day on or around September 28, 1988, Arthur Andersen noted the waiver of defaults by Meritor. It stated:

> Although the bank has waived compliance with these covenants at yearend, the presence of these violations in the coming year may enable the bank to demand repayment of the debt if it so chooses. As a result, the outstanding balance of the debt has been classified as a current liability in the financial statements. If the bank were to demand payment, the Company would not have sufficient assets to pay all of its current liabilities. The Company's management expects that it will be able to successfully refinance its bank debt.

Arthur Andersen prepared the following balance sheet in conjunction with its fiscal year end audit:

## ASSETS

| | |
|---|---:|
| **CURRENT ASSETS:** | |
| Cash | $ 352,080 |
| Trade receivables, less allowance for uncollectible accounts of $91,585 | 1,016,620 |
| Inventories (Note 3) | 3,556,989 |
| Prepaid expenses (Note 7) | 150,166 |
| Total current assets | $ 5,075,855 |
| **LONG–TERM RECEIVABLES (Note 8)** | $ 316,252 |
| **PLANT AND EQUIPMENT, at allocated cost (Note 2)** | |
| Land | $ 1,100,000 |
| Buildings | 4,100,000 |
| Machinery and equipment | 1,429,512 |
| | $ 6,629,512 |
| Less—Accumulated depreciation | 592,363 |
| | $ 6,037,149 |

DEFERRED FINANCING COSTS,—less accumulated amortization of
$33,000 (Note 5) ..................................................... $ 199,000

COST IN EXCESS OF NET ASSETS OF ACQUIRED BUSINESS—less
accumulated amortization

of $150,000 (Note 2) ................................................. $ 5,769,582

$17,397,838

## LIABILITIES AND STOCKHOLDERS' INVESTMENT

CURRENT LIABILITIES:

| | |
|---|---|
| Trade accounts payable | $ 2,250,085 |
| Accrued expenses (Note 7) | 2,276,060 |
| Debt (Note 5) | 9,004,400 |
| Customer deposits | 70,913 |
| Total Current Liabilities | $13,601,458 |
| DEFERRED TAXES (Notes 2 and 6) | $ 1,069,000 |
| Total Liabilities | $14,670,458 |

STOCKHOLDERS' INVESTMENT (Note 4):

Preferred stock. $1 par value—
 Series A—
 Authorized and outstanding—916,666 shares ................ $ 916,666
 Series B—convertible share for share into common—
 Authorized—1,000,000 shares
 Issued and outstanding—611,086 shares ...................... 611,086
Common stock. $.10 par value—
 Authorized—2,275,000 shares
 Issued and outstanding—1,129,756 shares .................... 111,976
Capital contributed in excess of par .............................. 1,309,272
Accumulated deficit ............................................... (222,620)

 Total stockholders' investment ................................ $ 2,727,380

$17,397,838

---

The Statement of Operations revealed the
following:

| | |
|---|---|
| NET SALES (Note 2) | $18,533,120 |
| COST OF GOODS SOLD | 15,481,677 |
| Gross profit | $ 3,051,443 |
| SELLING, GENERAL AND ADMINIS-TRATIVE EXPENSES | $ 1,939,205 |
| Income from operations | $ 1,112,238 |
| OTHER EXPENSES, net: | $ 1,127,958 |
| Interest expense | 206,900 |
| | $ 1,334,858 |
| Net Loss | $ (222,620) |

The gross profit margin for the fiscal year following the LBO was 16.47 percent. Despite the loss, Arthur Andersen issued a so-called clean opinion without a going concern qualification.

On October 12, 1988, Equus, Funston, and an individual by the name of James Prise lent O'Day a total of $650,000. (Tr. Ex. 4). Notwithstanding the loan, O'Day's financial health in the fall of 1988 was not good. The company's earnings before interest and taxes and net earnings were negative, and the days payable outstanding rose from 70 in July to 147 in December. The company's position deteriorated further after the first of the year. In February, the accounts payable stood at $2.162 million and the current liabilities, without including the revolver as a current liability, exceeded the current assets by well over $1 million.

Following the LBO, Gonsalves continued to prepare monthly Controller's Letters that tracked O'Day's decline. (M. Ex. 28). A balance sheet, income statement and cash flow statement were attached to each of the post-LBO Letters. In the July 1987 Letter, dated August 5, 1987, Gonsalves noted the continuing manpower problem. He also noted that, as planned, the company effectuated a price increase on August 1, 1987 due to substantial increases in the price of major commodity groups. However, due to price protected sales, Gonsalves reported gross margins were lower than anticipated. With respect to the accounts payable, he stated that "we anticipate DPO [days payable outstanding] to increase through the next months as we increase our payment terms from 30 to 60 days. We are making a conscious effort to increase our DPO, with the help of our vendors, so that we can have the necessary cash to carry us through the winter months."

In the August Controller's Letter, Gonsalves reported a continuing slippage in sales from the forecast—actual sales for the year were $265,000 less than anticipat-

ed. As in July, when the revolver was reduced by $616,000, the revolver was reduced in August by $304,000. In September, sales figures were still below the forecast. Hiring and keeping workers continued to be at the top of management's agenda, according to Gonsalves. He also reported that the number of days the accounts payable were outstanding increased by six to 47, "reflective of the efforts to extend payments to vendors." He added "[t]his will be a leveling off as the company has extended terms to vendors as much as possible." He was wrong.

The second quarter of fiscal year 1988 proved no better for O'Day as sales continued to fall below forecasts and the number of days payables remained outstanding rose to 56 in October. Gonsalves noted that cash flow was positive due to a reduction in receivables and an increase in payables. He also noted that the term loan was reduced by $150,000 and the IRB was paid off in the amount of $274,067.24. In November sales again fell below budget. EBIT and cash flow were both negative. Gonsalves reported that the effects of the October 1987 stock market crash were being observed in the boating industry, and he correlated eroding consumer confidence in the economy with the lack of dealer activity. He stated that the new tax laws put a stop to year end tax advantages. However, in December, EBIT was positive, although sales still lagged behind the forecast. Gonsalves indicated that $500,000 was received from 3I and "was immediately put to work supplying vendors with necessary payments." The money was also used to make payments to Meritor. The number of days the payables were outstanding stood at 75 in December of 1987.

In the January and February Letters, Gonsalves repeated the same themes as in prior months—sales below budgeted amounts and manpower shortages. In April,[9] Gonsalves averred that the recreational boating industry appeared to be go-

---

9. The March 1988 Controller's Letter is not a part of Meritor's Exhibit 28.

ing through a slump. Highlighting the cyclicality of the industry, he stated that "[b]oth the competition and the power boat industry are feeling the same effects, and report the worst season since 1984." Sales in April were $581,000 below budget; sales in May were $984,000 below budget; and sales in June were $572,000 below budget.

Dahill testified that during the fiscal year following the LBO the number of dealers began to decline. Additionally, he testified that after the LBO, Funston assumed more and more responsibility for marketing and replaced the firm's ad agency with an agency that lacked experience in the boating industry. These changes, as well as the termination of Brad Turner as Vice–President for Manufacturing in June of 1988, which required Dahill to perform Turner's job for four months in addition to his own, aggravated the downward spiral chronicled by Gonsalves. Indeed, Dahill testified the company was in turmoil in the fall of 1988. (Trans. Vol. II, p. 43). Finally, in April 1989, O'Day ceased operations.

Meritor and the Trustee stipulated that when the involuntary bankruptcy petition was filed O'Day owed Meritor $8,275,-156.02. The revolver had an outstanding principal balance of $1,314,633.69 and outstanding interest of $70,100.73, making a total outstanding indebtedness of $1,384,-734.42. The term loan had an outstanding principal balance of $6,112,500.00 and outstanding interest of $244,031.38, making a total outstanding indebtedness of $6,356,-531.38. The subordinated debt had an outstanding principal balance of $500,000.00 and outstanding interest of $32,319.44, making a total outstanding indebtedness of $532,319.44. Additionally, there were outstanding fees for the unused portion of the revolver in the amount of $1,570.78. ·

## III. MASSACHUSETTS LAW APPLIES

■ The first issue to be decided is whether Massachusetts or Pennsylvania law applies. The Trustee argues that pursuant to section 9.05 of the Loan and Security Agreement dated June 30, 1987 Pennsylvania law applies to the issues in this case. The Trustee reasons that Meri-

tor, having selected Pennsylvania law to govern disputes pertaining to the financing arrangement, should not now be permitted to ignore its own bargained-for choice of law. Meritor's response to the Trustee's contention is that the loan agreement was a contract that *it* entered into with O'Day. Emphasizing that the Trustee was not a party to that transaction, Meritor maintains that the Trustee is not entitled to avail himself of section 9.05 of the Loan and Security Agreement, and, hence, under applicable conflicts of law principles, Massachusetts law should be applied to the issues in the case.

The practical difference between applying Pennsylvania or Massachusetts law for purposes of this proceeding is significant. The application of Pennsylvania law would require Meritor to bear the burden of proof with respect to solvency in the context of the UFCA. Should Massachusetts law control the case, however, the Trustee would carry the burden of proof pertaining to solvency.

A recent United States Bankruptcy Court decision from this district pertaining to an alleged fraudulent conveyance provides an authoritative analysis of the conflict of laws issue presented here. *In re Morse Tool, Inc.*, 108 B.R. 384 (Bankr.D. Mass.1989). At the outset, the court in *Morse Tool* per Judge Kenner observed that:

[I]n order to settle this dispute, a bankruptcy court would normally first determine whose choice-of-law rules to apply: its own (the "federal common law") or those of the state in which it sits.... Whether the Court applies the federal common law or the law of Massachusetts, the result will be the same: it will apply the "multiple factor, 'interest analysis' or 'most significant relationship' analysis exemplified by the Restatement (Second) of Conflict of Laws (1971)."

*Id.* at 385 (citation omitted, footnote omitted). The court explained that under the approach of the Restatement, a court must apply the law of the state that has the most significant relationship to the parties, the

transfer, and the issue. *Id.* According to the court, this determination is made by evaluating certain "choice influencing considerations," such as:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be supplied.

*Id.* at 385–86. *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 631–34, 473 N.E.2d 662 (1985). *See also* Restatement (Second) of Conflict of Laws § 6(2) (1971).

In light of the choice influencing considerations, Judge Kenner ruled that the choice of law clause included in the security agreement carried "little weight" in the decision. She reasoned:

> ... this is a fraudulent conveyance action, not a contract action. And one of the parties to this suit—the Trustee, who stands in the shoes of the creditors—was not a party to the contract. The parties to a contractual conveyance cannot in their contract make a choice-of-law that binds creditors who allege that they were defrauded by the conveyance. The choice-of-law binds only parties to the contract, not the trustee or the creditors.

*In re Morse Tool, Inc.*, 108 B.R. at 386. Further the judge rejected the argument that *Desmond v. Moffie*, 375 F.2d 742 (1st Cir.1967), commands a different result, pointing out that *Desmond* dealt only with the issue of which Massachusetts statute of limitations to apply in a fraudulent conveyance action. *Morse Tool*, 108 B.R. at 386.

In weighing the considerations delineated in the Restatement, Judge Kenner gave considerable weight to the location of the property involved in the alleged fraudulent transfer, recognizing that "[t]he authorities ... have shown a preference for applying the law of the site of the conveyed proper-

ty." *Id.* at 387. She also found support from the fact that Massachusetts was the location of the majority of the debtor's manufacturing operations, employees, inventory, and other assets, and was the state with the largest concentration ... of the debtor's creditors. *Id.* at 388. Moreover, the court pointed out that Connecticut's sole connection to the case was that it was the transferee's place of business. *Id.* In sum, based upon the "multiple factor, significant contacts" analysis as it applied to the facts in that case, Judge Kenner granted the trustee's motion for summary judgement on the conflict of laws issue. *Id.*

Employment of the "significant contacts" analysis in this case leads to but one conclusion: Massachusetts law is the proper law to govern the fraudulent conveyance action between the Trustee and Meritor. The assets involved in the allegedly fraudulent transfer are located in Massachusetts, which alone weighs heavily in favor of using Massachusetts law. Secondly, the Debtor's manufacturing operations and its employees were located in Massachusetts. Additionally, even a cursory review of a list of O'Day's creditors reveals that the greatest concentration is found in Massachusetts. Finally, as in *Morse Tool*, the only connection between the state whose law was embraced in the Loan Agreement, Pennsylvania, and the cause of action, is that Meritor conducts its business in Pennsylvania.

■ Although in *Morse Tool* it was the transferee rather that the trustee who sought to avail itself of the contractual choice-of-law provision, the controlling principle remains the same: "a fraudulent conveyance suit is not a suit on a contract." *Id.* at 387. Thus, this Court rules that Massachusetts law should govern the resolution of the fraudulent conveyance action between the Trustee and Meritor. Consequently, the Trustee bears the burden of proof on the issue of solvency. The case law and reasoning relied upon by the Trustee simply does not warrant a different result, particularly as the Trustee raises the

same arguments that were rejected in *Morse Tool*.

Having concluded that Massachusetts law applies in this case, the statute of limitations issue raised by the parties is easily resolved. Section 546 of the Bankruptcy Code, 11 U.S.C. § 546, permits a trustee to file an action pursuant to either section 544 or 548 within two years from the date of his or her appointment. Thus, under the limitations period provided by the Bankruptcy Code, it is clear that the Trustee's fraudulent conveyance action has been commenced in a timely fashion since there is a six year statute of limitations for fraudulent conveyance actions in Massachusetts. Mass.Gen.Laws Ann. ch. 260, § 2 (West 1959).

## IV. APPLICABLE PROVISIONS OF THE UNIFORM FRAUDULENT CONVEYANCE ACT AND THE BANKRUPTCY CODE

The Trustee seeks to set aside Meritor's security interest in the collateral under sections 4, 5 and 7 of the UFCA. The Court has ruled that the version of the UFCA enacted in Massachusetts applies. Mass. Gen.Laws Ann. ch. 109A, §§ 1–13 (West 1990). Specifically, the Trustee claims that O'Day and Meritor intended to hinder, defraud and delay creditors of O'Day pursuant to section 7 of the UFCA which provides as follows:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors.

*Id.* at § 7.

The Trustee argues that O'Day did not receive "fair consideration" in exchange for Meritor's security interest in the collateral and that O'Day was insolvent or was rendered insolvent as a result of the transfer pursuant to section 4 of the UFCA. Section 4 provides as follows:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard

to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

*Id.* at § 4.

The Trustee claims that O'Day did not receive "fair consideration" and was left with "unreasonably small capital" as a result of the transfer pursuant to section 5 of the UFCA. Section 5 provides as follows:

> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction, for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction, without regard to his actual intent.

*Id.* at § 5.

Section 3 of the UFCA defines "fair consideration." It states in pertinent part:

> Fair consideration is given for property or obligation—
>
> (a) When in exchange for such property or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied. . . .

*Id.* at § 3.

Section 2 of the UFCA defines "insolvency." It states as follows:

> A person is insolvent within the meaning of this chapter when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

*Id.* at § 2.

In addition to his UFCA claims, the Trustee also asserts that Meritor's recordation of a mortgage on the Fall River real estate within one year of the filing of the involuntary bankruptcy petition and order for relief constitutes a fraudulent transfer under section 548 of the Bankruptcy Code. Section 548 provides in pertinent part:

> (a) The trustee may avoid any transfer of an interest of the debtor in property,

or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

\* \* \* \* \* \*

(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value, to the debtor in exchange for such transfer or obligation.

(d)(1) For the purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, but if such transfer is not so per-fected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition.

(2) In this section—

(A) "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor; ...

11 U.S.C. § 548.

Lastly, the Trustee seeks to equitably subordinate Meritor's claims under section 510(c) of the Bankruptcy Code which provides as follows:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510.

## V. FAIR CONSIDERATION

■ The threshold issue in examining the LBO under the UFCA is whether O'Day received fair consideration. If it did, the Court's inquiry under sections 4 and 5 of the UFCA necessarily must end because both sections require a showing that a conveyance was made (or an obligation incurred) without fair consideration. Fair consideration is given when in good faith, as a fair equivalent, and in exchange, property is conveyed or an antecedent debt is satisfied. Mass.Gen.Laws Ann. ch. 109A, § 3 (West 1990). Fair equivalence only requires that the value of the consideration be reasonably equivalent rather than exactly equivalent in value to the property transferred or obligation assumed. *See De Aragon v. Chase Manhattan Bank,* 457 F.2d 263, 266 (1st Cir.1972).

Clearly, if property is transferred or an obligation is incurred gratuitously there is no fair consideration. In the context of a leveraged buyout, the analysis may not be so simple. However, when a target company assumes liabilities or transfers security interests in its property and the consideration (or loan proceeds) is immediately passed to target's shareholders or third parties then the absence of fair consideration may be equally evident.

■ In *Matter of Ohio Corrugating Co.,* 70 B.R. 920 (Bankr.N.D.Ohio 1987), the court outlined the requisite inquiry in the context of both section 548 of the Bankruptcy Code and Ohio's version of UFCA. The court, citing *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2d Cir. 1981), which construed section 67(d) of the Bankruptcy Act, stated:

> [I]t is necessary to show an economic benefit to the entity incurring the obligation or making the transfer. An analysis of an allegedly fraudulent transfer must be directed at what the Debtor surrendered and what the Debtor received, irrespective of what any third party may have gained or lost ... However, the transaction's benefit to the Debtor need not be direct. Instead the benefit may come to the Debtor indirectly through benefit to a third party. If the consideration or value given to the third party ultimately lands in the debtor's hands or otherwise confers an economic benefit upon the Debtor, the estate has been preserved and a showing will not be made....

*Matter of Ohio Corrugating Co.,* 70 B.R. at 927. *See also Weiboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 505 n. 25 (N.D. Ill.1988). In other words, since the purpose of fraudulent conveyance law is to protect creditors, the issue of fair consideration is analyzed from the point of view of creditors of the target company. *See United States v. Gleneagles Investment Co., Inc.,* 565 F.Supp. 556, 574 (M.D.Pa.1983), *aff'd sub nom. United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987).

Additionally, in analyzing the fair consideration requirement of the UFCA in the LBO context, courts not infrequently "collapse" the discrete steps employed by the parties in structuring the transaction. In *Wieboldt Stores* case, the court, after reviewing the *Tabor Court* case and *Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988), stated that "[t]hese cases indicate that a court should focus not on the formal structure of the transaction but rather on the knowledge or intent of the parties involved in the transaction." 94 B.R. at 502. In view of the fact that all parties, including Meritor, were aware of the structure of the transaction and participated in implementing it, the Court will focus on the substance of the LBO as one transaction, not on its form.

The Trustee, on the one hand, maintains, as he obviously must, that O'Day did not receive fair consideration. In his words, O'Day gave literally millions of dollars of liens to Meritor and encumbered virtually all of its existing assets in exchange for $1,344.00 in loan proceeds. Meritor, on the other hand, states that O'Day received fair consideration in the form of 1) the cancellation of the Intercompany Notes in the aggregate amount of $14,274,145; 2) the establishment of a $2.5 million revolving line of credit; and 3) the term and DIAL loans. Meritor argues that just because the Debtor utilized the proceeds to pay prior shareholders and that the Bank was aware of the payment does not mean that O'Day did not receive fair consideration in exchange for the security interests granted. In short, the Bank concludes that collapsing the transaction is unwarranted in this case. Indeed, Meritor argues that the post-acquisition company was a stronger, more viable entity than the pre-acquisition company since the Intercompany Notes were cancelled and $2,450,000 in equity (22% of the purchase price) was infused into the company.

■ The Court is not persuaded that the loans advanced by Meritor constituted fair consideration. When the transaction is viewed in its totality, it is clear that the proceeds from the term loan and the DIAL

loan were merely passed through O'Day to the selling shareholder, Bangor Punta Marine Products Corp. With respect to the line of credit, the Court agrees with the proposition set forth in *In re Metro Communications, Inc.*, 95 B.R. 921 (Bankr.W. D.Pa.1989). In that case, a bank argued that the debtor received reasonably equivalent value because it received a line of credit. The court ridiculed this notion, stating the following:

> Such circular logic merely begs the question, because all the Debtor really received was the opportunity to incur an additional ... debt. If Debtor drew against the line of credit, and it did, Debtor would have a present cash asset. Debtor would also have a newly created identical liability, which would soon be greater than the asset due to accruing interest.

*Id.* at 934.

■ Thus, the issue of fair consideration hinges on the cancellation of the Intercompany Notes. Section 7.05 of the Agreement of Purchase and Sale provides the following:

> *Notes.* As of the Closing, neither of the Companies shall have any liability under (i) the Note from Prindle to Lear Siegler, Inc., dated February 12, 1987, in the original principal amount of $1,357,720, due and payable on June 30, 1985, or (ii) the Note from O'Day to Lear Siegler, Inc., dated February 12, 1987, in the original principal amount of $12,916,425, due and payable on June 30, 1995....

Notably, neither of the Intercompany Notes was payable to LSI. Rather, they were payable to LS Acquisition Corp., an entity that was not identified on the record.

The 1987 LBO of LSI by Forstmann was achieved through a complex series of incorporations, transfers and mergers involving a number of entities that ultimately produced O'Day/Cal Sail Boats Corp. and Prindle Boats Corp., as well as their parent holding company, Bangor Punta Marine Products Corp. This seemingly arbitrary arrangement was, in fact, the result of a tax planning vehicle known as a "mirror subsidiary" structure. The primary purpose of the mirror subsidiary method of structuring acquisitions prior to the Revenue Act of 1987 was the deferral of gain recognition by the acquiring corporation. *See* Lipton, "Corporate Governance in the Age of Finance Corporatism," 136 U.Pa.L.Rev. 1 (1987); Oesterle and Norberg, "Management Buyouts: Creating or Appropriating Shareholder Wealth?" 41 Vand.L.Rev. 207 (1988). An analysis of the mirror subsidiary structure follows based upon the trial deposition of Stephen Harfenist ("Harfenist"), a senior tax manager in the LBO Services Group of Deloitte Haskins & Sells, the accounting firm employed by Forstmann. The Court's analysis depicts three stages. In reality, the stages probably occurred simultaneously.

The first "stage" (Stage I) in the execution of a mirror subsidiary transaction, according to Harfenist, requires the creation of a holding company, which becomes the parent of mirror subsidiary corporations. In anticipation of the sale of certain assets of the target company subsequent to its acquisition, individual subsidiaries of the holding company are created which "mirror" designated assets (i.e., "mirror subsidiaries"). Lastly, the acquiring corporation is established exclusively for the purpose of acquiring shares of the target corporation. Shares of the acquiring entity are held by the mirror subsidiaries in proportion to the value of the assets which they purport to mirror relative to the value of the target concern as a whole. When the acquisition of the target is complete, the acquiring corporation is merged into the target, the latter being deemed the surviving entity. Thus, in its simplest form, the mirror subsidiary structure involves three tiers consisting of a parent holding concern, any number of mirror subsidiaries, and an acquisition corporation owned directly by the mirror subsidiaries and indirectly by the holding company.

The second phase (Stage II) of an acquisition that employs the mirror subsidiary format involves the liquidation of the merged target and acquisition corporations. Upon liquidation, the mirror subsidiaries receive those specified target company as-

sets for which they were created. A dollar value, attributable to the assets which are distributed, is contemporaneously allocated to the mirror corporations in proportion to the value of the assets acquired vis-a-vis the total value of the target corporation. The dollar amount allocated to the mirror subsidiaries represents basis for the parent holding concern by which a later determination of gain can be made for tax purposes. That is, upon asset distribution and value allocation to the mirror subsidiary, shares of the subsidiary may be sold by its parent holding corporation, theoretically, without recognition of gain.

The final "stage" (Stage III) of a mirror subsidiary type acquisition entails the assumption and allocation of debt by the mirror units upon liquidation of the merged target company. This "stage" is merely a subpart of the asset distribution and value allocation of Stage II, but is highly instructive with respect to the Intercompany Notes. The analysis of this stage simply involves an examination of the capital structure of the mirror subsidiary framework. When the mirror subsidiary framework is established in Stage I, an initial equity investment is contributed to the holding company who uses this capital to purchase all shares of the mirror subsidiaries. Specifically, the holding company will pay the mirror unit an amount corresponding to the value of target company assets that each will receive upon liquidation of the merged target and acquiring corporation. In turn, the mirror entities purchase shares of the acquisition corporation, thereby providing the latter with the equity portion of the target's purchase price. The balance of the acquisition costs are loaned directly to the acquiring corporation from the holding company which is responsible for any actual borrowing. As stated previously, at this juncture, the merged target and acquisition businesses are liquidated, the assets are distributed, and the corresponding value allocation is made. In addition, the mirror subsidiaries assume a proportional share of the loan made to the acquiring enterprise by the parent holding company. The amount of debt assumed by the mirror entity is evidenced by the execution of an intercompany note in favor of the holding company. At the conclusion of these three "stages," the mirror subsidiaries constitute individual salable units whose shares may be sold by the parent holding concern. Because the transaction, as structured, creates basis in the hands of the holding corporation, these shares may be sold with minimal, if any, recognition of capital gain.

The record indicates that within the context of the mirror subsidiary framework as outlined above: (a) Bangor Punta Marine Products Corp. was established as the parent holding corporation, and (b) Prindle Boats Corp. and O'Day/Cal Sail Boats Corp. (formerly B.P. 14 and B.P. 15), were two mirror subsidiaries of the holding concern. The remaining party essential to the mirror subsidiaries configuration, the acquisition corporation, was not conclusively established, but appears to have been LS Acquisition Corporation, the payee on the Intercompany Notes.

The testimony compels the conclusion that the mirror subsidiary structure employed by Forstmann in its acquisition of LSI, was designed solely for the purpose of creating a fair market value basis that would enable Forstmann to sell shares of the mirror subsidiaries without a consequent recognition of gain.

Prior to liquidating the merged target and acquisition corporations, but after the agreement between LSI and Forstmann as to price, appraisals, which purported to value the assets of O'Day/Cal and Prindle at $20,100,000 and $2,000,000, respectively, were obtained. (M. Ex. 109, pp. 56–66, 117–118). The amount of the Intercompany Notes later executed by the mirror subsidiaries equalled the difference between these "debt-free" appraised values and the equity which was used to acquire those assets (i.e., $7,500,000 and $700,000). (M. Ex. 109, pp. 55–90, 110; M. Ex. 111).

Meritor argues that O'Day/Cal and Prindle acquired assets worth those amounts. However, the appraisals that were prepared by Arthur D. Little Appraisal Services were not introduced into evidence, and there was no testimony about how these

so-called debt-free appraisals were prepared. Accordingly, the Court cannot accept these figures as evidence of the value of O'Day/Cal and Prindle. Even if it could, then a question would remain as to why Bangor Punta sold the companies for substantially less than their appraised values. It bears reemphasis at this point that the primary purpose of the mirror subsidiary acquisition structure was to create basis from which to make a later determination of gain (or loss) upon the sale of the mirror subsidiary's stock. The only inference that can be drawn from Harfenist's testimony, given the execution of the Intercompany Notes for approximately $14.2 million and an equity investment of $8.2 million, which was immediately used by the subsidiaries to buy stock of LSI, is that the basis of O'Day/Cal and Prindle stock in the hands of Bangor Punta Marine Products Corp. was approximately $22.4 million. (M. Ex. 109, pp. 108–110). Accordingly, when the stock of O'Day and Prindle was sold to LTF Acquisition Corporation for a net price of approximately $11.3 million, the seller, Bangor Punta Marine Products Corp., would have been entitled to recognize a *substantial* capital loss. (M. Ex. 109, pp. 108–110).

Echoing Harfenist, Funston also testified that the mirror subsidiary structure was "only a tax device" and that the dollar amounts of the cancelled notes were merely "cost allocations." (Tr. Vol II, pp. 161–62). Additionally, no evidence was presented showing that payments were ever made on the Intercompany Notes. Indeed, the identity of LS Acquisition Corp. is mysterious since the Purchase and Sale Agreement referred to LSI as the payee of the notes. Moreover, Dahill could not identify Winston Hutchins, the individual who signed the notes on behalf of O'Day/Cal and Prindle, corroborating the inference that the companies were unaffected operationally by the existence of the Intercompany Notes.

Finally, the Intercompany Notes, though referenced in some correspondence between Goldman Sachs and Funston, were not scrupulously included as liabilities on the financial statements of O'Day/Cal and Prindle. Harfenist and Voiland, both certified public accountants, testified that under current accounting standards, intercompany indebtedness must be included on a company's balance sheet if the item is an "actual" or "real obligation" of the company. (Trans. Vol. IV, p. 116). Thus, the Court concludes that the cancellation of the Intercompany Notes did not provide fair consideration, as the signatories to the notes did not contemplate their repayment from operations. The Intercompany Notes appeared to have been created only for the tax advantages conferred by the mirror subsidiary structure. In sum, the Court cannot find that the term loan, the revolving loan and the Intercompany Notes provided fair consideration to the Debtor.

## VI. FINANCIAL CONDITION

### A. Insolvency

Commentators agree that courts have not been uniform in construing the meaning of insolvency for purposes of section 2 of the UFCA. *See* Cieri, Heiman, Henze, Jenks, Kirschner, Riley and Sullivan, "An Introduction to Legal and Practical Considerations in the Restructuring of Troubled Leveraged Buyouts," 45 Bus.Law. 333, 359 (1989) (hereinafter Cieri); Queenan, "The Collapsed Leveraged Buyout and the Trustee in Bankruptcy," 11 Cardozo L.Rev. 1, 14 (1989). In short, some courts have applied a balance-sheet test (excess of total debts over total asset values), while others have interpreted "the present fair salable value" language of section 2 of the UFCA as requiring insolvency in an equity sense (inability to pay debts as they mature in the ordinary course). *Id.*

Indeed, in *United States v. Gleneagles Investment Co., Inc.,* 565 F.Supp. 556 (M.D.Pa.1983), the district court appeared to blend the tests. It stated the following:

> These debts of the Raymond Group are to be compared to the "present, fair, salable value" of the Raymond Group's assets. 39 Pa.Cons.Stat. § 362. The phrase means that value which can be obtained if the assets are liquidated with reasonable promptness in an arms-length

transaction in an existing and not theoretical market.

This meaning of the phrase "present, fair, salable value" is in accord with the interpretation given thereto by the Pennsylvania Supreme Court in *Larrimer v. Feeney*, 411 Pa. 604, 192 A.2d 351 (1963), wherein it stated:

> A reasonable construction of the statutory definition of insolvency indicates that it not only encompasses insolvency in the bankruptcy sense, i.e., a deficit net worth, but also includes a condition wherein a debtor has insufficient presently salable assets to pay existing debts as they mature. If a debtor has a deficit net worth, then the present salable value of his assets must be less than the amount required to pay the liability on his debts as they mature. A debtor may have substantial paper net worth including assets which have a small salable value, but which if held to a subsequent date could have a much higher salable value. Nevertheless, if the *present* salable value of his assets are [sic] less than the amount required to pay existing debts as they mature, the debtor is insolvent.

> *Larrimer v. Feeney*, 411 Pa. at 608, 192 A.2d at 197 (emphasis in the original, citation omitted)

*Gleneagles*, 565 F.Supp. at 578. Likewise, in *In re Ohio Corrugating Co.*, 91 B.R. 430 (Bankr.N.D.Ohio 1988), a case decided under § 548 of the Bankruptcy Code, the court examined both the reconstituted balance sheet evidence and the debtor's ability to pay its debts as they matured. The court, after categorizing the reconstituted balance sheet evidence as doubtful, ultimately relied upon the equitable or cash flow test to find that the plaintiff/creditors' committee had not sustained its burden of proof.

Courts and commentators also agree that the book value of an LBO company's assets is not controlling for purposes of an insolvency analysis. *See F.S. Bowen Electric Co., Inc. v. United States Fidelity & Guaranty Co.*, 256 F.2d 46, 49 (4th Cir. 1958); *Morgan Guaranty Trust Co. v. Hellenic Lines Ltd.*, 621 F.Supp. 198, 220 (S.D.N.Y.1985) (citing *Seligson v. New York Produce Exchange*, 394 F.Supp. 125 (S.D.N.Y.1975)). Moreover, generally accepted accounting principles ("GAAP") do not control a court's decision. Citing *In re Arrowhead Gardens, Inc.*, 32 B.R. 296 (Bankr.D.Mass.1983), the *Ohio Corrugating* court stated that "[i]n spite of their propriety according to GAAP, a court may modify balance sheet entries (i.e., increase/decrease the value of an asset or reduce/elevate the amount of the liability) in order to more accurately reflect the financial condition of the Debtor." *In re Ohio Corrugating Co.*, 91 B.R. at 438 n. 11. *Cf. In re Roco Corp.*, 701 F.2d 978, 983 (1st Cir.1983) ("unaudited financial statements may be admissible as the best available evidence"). Accordingly, most courts analyze LBO's by "reconstituting" balance sheets as of the date an LBO is consummated. Cieri, *supra*, at 360.

Compounding the difficulties associated with the lack of clear judicial interpretation of the meaning of insolvency under the UFCA, as outlined above, controversies exist as to whether there are substantive differences between the language used in the UFCA and the Bankruptcy Code and as to whether assets should be valued to reflect "going concern value." As one commentator observed, "[s]ome courts disregard going concern values and conduct valuation analyses on a piecemeal basis, effectively decreasing the capitalization of the target, while others have been willing to look at the business as a whole." Cieri, *supra*, at 361. *See In re Ohio Corrugating Co.*, 91 B.R. 430, 437–38 (Bankr.N.D. Ohio 1988) (for purposes of § 548, inventory valued on a going concern basis, i.e., at cost; machinery and equipment valued pursuant to a "nuts and bolts" appraisal as such an appraisal "more nearly reflects a proportional amount of the eventual sales price"); *Wieboldt Stores, Inc. v. Scholtenstein*, 94 B.R. 488, 505 (N.D.Ill.1988) (for purposes of § 548, illiquid assets may not be relevant for purposes of solvency analysis); *but see Kupetz v. Continental Illinois National Bank & Trust Co.*, 77 B.R. 754, 763 (C.D.Cal.1987), *aff'd sub nom. Ku-*

*petz v. Wolf,* 845 F.2d 842 (9th Cir.1988) (for purposes of the UFCA, going concern value should have been used); *In re Vadnais Lumber Supply, Inc.,* 100 B.R. 127, 131 (Bankr.D.Mass.1989) (for purposes of § 548, going concern value is proper standard of valuation unless "at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic"); *In re Bellanca Aircraft Corp.,* 56 B.R. 339, 387 (Bankr.D. Minn.1985) ("Only where a business is wholly inoperative ... will going concern valuation be abandoned in favor of an item by item fair market valuation.") 2 *Collier on Bankruptcy* ¶ 101.32 [5] (15th ed. 1990) ("[fair] valuation must be made from the vantage of a going concern ... subsequent dismemberment or impossibility to dispose of [assets] ... should not enter the picture.").

Elaborating on the position taken in *Vadnais Lumber,* Judge Queenan has stated that

> [t]he best evidence of Target's going concern value immediately after the sale will usually be the price paid in the LBO, as adjusted for the LBO transfers and obligations lacking adequate consideration, provided that LBO interest payments do not turn profits into losses. Courts have always been most impressed with what an actual sale of the property brings at or near the time in question.... In arriving at Target's post-LBO value, downward adjustments should be made to reflect the transfers or obligations for which Target did not receive adequate consideration. These adjustments would normally leave some positive value even if Target received absolutely no consideration. Typically, the buyer furnishes some portion of the LBO price from its own small capital. This portion remains unaffected by any adjustment made to the pre-LBO price to reflect Target's transfers and obligations. Therefore, the LBO price as so adjusted should normally establish that Target had at least some minimal going concern value immediately after the transaction, thus making it solvent.

\* \* \* \* \* \*

Traditional principles of going concern valuation will also usually support Target's solvency. The value of a business as a going concern is arrived at largely through a capitalization of its earnings.... Another valuation method applies the capitalization multiple to a discounted projected future earnings figure. Both methods should take into account the new interest expense on Target's LBO debt. If the adjusted earnings figure shows, as it usually does, that Target will earn some profit after the LBO, any capitalization of this profit necessarily establishes solvency.

\* \* \* \* \* \*

Occasionally, the new interest expense will be likely to (and in fact does) cause losses in the years immediately after the LBO. Even though the buyer's projections show Target returning to the black after a few years, these early losses should eliminate capitalization of earnings as the method for determining Target's going concern value immediately after the LBO. Although a discounted projected earnings figure for some year in the future may in some circumstances be an acceptable base for capitalization, it is quite speculative when compared to the immediate certain losses that will be sustained in these situations. A business which lacks the present ability to earn a profit has a value equal to the total of its asset values less its liabilities. Because Target will seldom have excess assets the asset-liability approach is likely to indicate a negative value and therefore insolvency. The adjusted LBO price remains as some evidence of post-LBO solvency. It could be argued that the buyer had a small amount of its own funds at risk, but there is a better reason for rejecting the adjusted LBO price as an indicator of Target's post-LBO value in these circumstances. The LBO price was based upon going concern considerations, whereas the post-LBO losses demonstrate that the transaction placed Target on the brink of collapse so that all indica-

tors of value related to a going concern standard of valuation should be ignored. Queenan, *supra,* at 15–17 (footnotes omitted).

The Trustee's insolvency argument is predicated upon a balance sheet approach. The Trustee's expert accountant, who readily conceded he was not a certified appraiser or an expert in valuing businesses, applied the discount factors employed by Jones in the Credit Memo to the book value of individual assets. He reconstructed the following balance sheet as of June 30, 1987:

| | |
|---|---:|
| Cash | $ 0 |
| Accounts receivable, net | 428 |
| Inventories FIFO (3) | 1,551 |
| Other current assets | 0 |
| Total current assets | $1,979 |
| | |
| P.P. & E., net (5) | 4,210 |
| Intangibles, net | 0 |
| TOTAL ASSETS | $6,189 |
| | |
| MERITOR revolver (credit line) | $1,870 |
| IRB—current | 262 |
| MERITOR term loan current | 600 |
| Accounts payable | 1,259 |
| Accrued liabilities | 2,959 |
| Total current liabilities | $6,950 |
| | |
| IRB | $ 0 |
| MERITOR letter of credit | 400 |
| MERITOR term loan | 6,600 |
| MERITOR subordinated loan | 500 |
| Total long-term debt | $7,500 |
| | |
| Deferred income taxes | $1,069 |
| | |
| Equity (capital deficiency) | (9,330) |
| | |
| TOTAL LIABILITIES AND EQUITY | $6,189 |

The difference between Voiland's balance sheet and Arthur Andersen's opening balance sheet appearing on page 382 of this opinion is most apparent with respect to the value Arthur Andersen attributed to the intangible assets, i.e., $6,549,000, compared to the value Voiland attributed to them—zero. The Accounting Principles Board Opinion 16 ("APB 16") provides for the recordation of goodwill and indicates that it is the difference between the cost of an acquired company and the sum of the fair values of tangible and intangible assets less liabilities (the difference is also said to be evidence of unspecified intangible values). Indeed, in *In re Roco Corp.,* 701 F.2d 978 (1st Cir.1983), the Court of Appeals for the First Circuit observed:

> Typically goodwill will not be reported on a balance sheet unless there is hard evidence of its existence and value-for example, a balance sheet might reflect the goodwill of a subsidiary which a parent corporation has purchased by paying an amount in excess of the fair value of the subsidiary's assets in an arms' length transaction.

*Id.* at 983. However, the Trustee asserts that the $6,549,000 figure is no more than a "plug-number" (the difference between the

total liabilities and equity and the value of the other assets) that bears no rational relationship to the real values of the company's intangible assets. The Trustee emphasizes that the intangible assets were never appraised and were incapable of orderly liquidation. Moreover, he points out that O'Day merely had an informal right to use patents and trademarks, a right without commercial value in the context of a solvency analysis, since O'Day did not, in fact, own the patents and trademarks at the time of closing.

With respect to the accounts receivable, inventory, machinery, equipment and real estate, the Trustee's expert recorded the book values ascribed to the accounts receivable and inventory by Arthur Andersen. He then reduced Arthur Andersen's figures by percentages set forth in the credit memorandum prepared by Jones (M. Ex. 36), namely 20% and 50% respectively. With respect to the real estate, Voiland did not utilize a discounted book value. Rather, he discounted the value given to the property by Valuation Research Corporation (M. Ex. 6) by 20% and subtracted $262,000 attributable to IRB debt. However, he accepted Thomas Industries, Inc.'s appraised value of $312,455 for the manufacturing equipment, office furniture, and office machines. (M. Ex. 7). That appraisal, which included an itemization of all equipment, used a "fair market liquidation value" which was defined as "the value that would be received by private negotiation over an extended period of time, six to eighteen months."

Meritor's expert, Heupel, testified that the opening day balance sheet should reflect cash in the amount of $856,000. He indicated that this figure was a composite of a negative cash balance inherited by the new owners and the proceeds from the Clawback. Heupel ascribed a value of $635,000 to the accounts receivable, $100,000 more than Arthur Andersen, because he found documentation that all the company's receivables were collected in full. Heupel wrote up the inventory of $3.101 million by $65,000 to reflect the fact that the company used that amount of inventory over time. With respect to "other current assets," Heupel testified that they should be valued at $400,000. He included in this category net proceeds from the sale of Prindle (i.e., $400,000 less liabilities of approximately $133,000) and prepaid assets such as insurance. Heupel accepted the appraised value of $6.252 million as the going concern value for the property, plant and equipment. Finally, Heupel testified that the intangibles should be valued at $6,250,000. He indicated that there were two components to that figure—$6 million for goodwill and $250,000 for a note receivable. (Trans. Vol V, pp. 108–115). Leaving aside the $6 million attributable to goodwill, the total assets according to Heupel had a value of $11,558,000.

With respect to the liabilities, Heupel did not quarrel with the amounts set forth in the Arthur Andersen opening day balance sheet, namely $6.95 million in current liabilities, $7.1 million in long term liabilities and $1.069 million in deferred income taxes. However, Heupel observed that Voiland included the $262,000 IRB debt as a current liability, highlighting the apparent double counting of this liability since Voiland also used it to reduce the value ascribed to the real property. Heupel also criticized Voiland for including among the liabilities the total deferred tax liability of $1.069 million, since it was predicated on a much higher cost for the property, plant and equipment, and the $400,000 letter of credit since it was not drawn against by the selling shareholders.

In short, using the testimony of its expert, Meritor attacks the Trustee's reconstituted balance sheet on two principal grounds. First Meritor argues that discounting book values was inappropriate, as was the double counting of the IRB debt. Additionally, Meritor attacks Voiland for failing to give any value to the intangibles in light of their ultimate sale in 1990 for $620,000.

The short answer to Meritor's observations in this regard is that the opening day balance sheet would still show a negative net worth even if a $620,000 value was ascribed to the intangibles and all book values were accepted in the amounts set

forth in the Arthur Andersen balance sheet. Indeed, the company would still be insolvent to the tune of approximately $3.5 million if the Court were to accept Heupel's figures, except for the $6 million attributable to goodwill.

Meritor's stronger argument is that the Trustee simply used the wrong valuation standard and, by not producing any evidence of insolvency based upon a going concern valuation, failed to meet his burden of proof. In asserting that a going concern valuation is the only appropriate one to use in the circumstances of this case, Meritor highlights the company's positive EBIT and cash flow for the five years prior to the LBO (the average EBIT was $1,876,500 if the year 1985 is excluded (M. Ex. 88); cash flow ranged from $983,000 to $3,189,000 in those five years (M. Ex. 89)). The Bank argues that the capitalization of cash flow is a more appropriate method of valuation than capitalization of earnings since a purchaser of a company is more concerned with the actual amount of money available to service debt and pay bills than it is with EBIT. Thus, Meritor suggests that a conservative capitalization of cash flow based upon the 1986 cash flow of $2,869,000 would indicate a value of O'Day in excess of $15,000,000, a sum well in excess of the $11.3 million ultimately paid. However, the Court cannot help but observe that if the same rate is applied to the 1987 estimated cash flow contained in Meritor's Exhibit 89, i.e., $1,967,000, O'Day's value would be less than what was ultimately paid.

Meritor also points to evidence it introduced to establish the solvency of the company on June 30, 1987. It states that the best evidence of the solvency of O'Day at the time of the transfers in question is the unqualified audited financial statements of O'Day for the fiscal year end July 2, 1988 prepared by Arthur Andersen. These figures show a positive net worth of $2,727,-380. According to Meritor, if O'Day was solvent on July 2, 1988 after sustaining an operating loss of approximately $222,620, then it was necessarily solvent on June 30, 1987.

Despite Meritor's observations about the July 2, 1988 financials, the July 2, 1988 balance sheet contains as an asset a $5,769,582 figure identified as "cost in excess of net assets of acquired business," which is defined "cost in excess of the fair value of the net assets of the acquired business." It also shows that what was formerly long term debt was included with current liabilities because of violations of Meritor loan covenants. Thus, if total debt is compared with total assets, excluding the so-called cost in excess of net assets of acquired business, there is a substantial shortfall, not a positive net worth of $2,727,380.

To buttress its position that the company must be valued as a going concern, Meritor notes that O'Day was highly marketable after Forstmann's acquisition. Meritor also emphasizes the fact that the company operated for 22 months prior to the filing of the involuntary petition. Finally, Meritor argues that its expert testified that based on the sales price of $11.3 million, O'Day was solvent to the extent of at least $2.45 million, a position Meritor claims is consistent with the one espoused by Judge Queenan, namely that "the best evidence of a corporation's going concern value immediately after the sale will usually be the price paid in the LBO, *as adjusted for the LBO transfers and obligations lacking adequate consideration, provided that LBO interest payments do not turn profits into losses.*" Queenan, *supra*, at 15 (emphasis added). Not surprisingly, in making this argument Meritor omits the last two phrases. Since O'Day did, in fact, suffer an operational loss at the end of fiscal year 1988, the weight of Meritor's evidence in this regard is problematic.

■ Clearly, the issue that must be resolved is whether the company should be valued as a going concern on the theory that the whole is more valuable than the sum of its parts, *see Robinson v. Watts Detective Agency, Inc.,* 685 F.2d 729 (1st Cir.1982), *cert. denied, Consolidated Service Corp. v. Robinson,* 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983), or whether the language "present fair salable value of

... assets" requires a separate analysis of each component of O'Day's balance sheet. Assuming that the UFCA requires, in the first instance, a going concern valuation, Meritor is correct: the Trustee presented no evidence of the company's value as a going concern. The only evidence of that value was introduced by Meritor, namely $2.45 million. However, as has been previously noted, O'Day suffered a loss in its first fiscal year after the LBO. Moreover, the Trustee points to the fact that had appropriate gross profit margins been utilized in the financial projections a loss would have been foreseen.

Weighing the arguments of the parties against the standards advocated by commentators does not produce an unequivocal result. For example, when the price paid in the LBO is adjusted for the LBO transfers and obligations lacking adequate consideration, O'Day may be said to have a going concern value of approximately $235,000, plus the $2.45 million furnished by management, 3I and Funston. The $235,000 figure represents loan proceeds that actually were available to O'Day at the closing most of which were used by the company to pay closing fees. (Tr. Ex. 61). However, since the LBO principal and interest payments may be said to have turned profits into losses, what may potentially have been the best evidence of going concern value according to Queenan is suspect. The Court notes in this regard that O'Day's interest payments on the term loan alone exceeded $60,000 per month. Moreover, Meritor and Funston estimated total interest payments under the revolver, term and DIAL loans to be $1.1 million. Total interest and principal payments, including payment of the IRB, then were anticipated to be at least $1.962 million (Trans. Vol. II, p. 206) and perhaps as high as $2.025 million. (Trans. Vol. VI, p. 117). Actual EBIT for the 1987 and 1988 fiscal years was $1.467 million and $905,000 respectively. (M. Ex. 88). Actual cash flow for the fiscal years 1987 and 1988 (without excluding capital expenditures) was $1.967 million and $552,000, respectively. (M. Ex. 89). In the reduced sales scenario, Funston and Jones projected EBIT of $1.976 million and

cash flow of $1.896 million for fiscal year 1988. (Tr. Ex. 54).

Commentators also speak about capitalization of earnings and cash flow. In this regard, the evidence is equally suspect principally because of the projections utilized by Funston and Meritor. These projections will be discussed fully in the next section. However, if reasonable projections would have shown losses in the years after the LBO, the view espoused by Queenan ("A business which lacks the present ability to earn a profit has a value equal to the total of its asset value less its liabilities." Queenan, *supra*, at 17), would support the Trustee's position that a balance sheet approach is appropriate.

The Court concludes that, in the context of this case, section 2 of the UFCA requires a balance sheet test—debts must be compared to the value of assets. Had the drafters of the UFCA contemplated valuation of a company as a whole as opposed to valuation of individual assets suitable language easily could have been employed. The statute refers to "assets." Accordingly, the Court will look to the value of *assets*. With respect to the balance sheet of O'Day, the solvency issue turns on one number—the value attributable to the intangible assets. Parenthetically, the Court is not persuaded that the values attributed to the other assets and liabilities by Heupel in his testimony are valid. A balance sheet is a snapshot of a company's financial posture on a particular day. Heupel's write up of asset values such as the accounts receivable by $100,000 because they proved to be 100 per cent collectible was inappropriate even if a going concern valuation sanctions the use of book values. Likewise, the elimination of the letter of credit as a liability appears to the Court to be unwarranted because on June 30, 1987 no one could have foreseen that it would not be available to the selling shareholders. Additionally, the Court notes the validity of some of Meritor's criticisms of Voiland's balance sheet. Nevertheless, the solvency analysis turns on the value attributable intangibles because, even assuming the correctness of all of Heupel's figures, the

company was insolvent on June 30, 1987, unless the value of the intangibles was in excess of $3.5 million.

 The Court finds that the Trustee has sustained his burden of proof on the issue of insolvency. Clearly, the fact that on June 30, 1987 the company did not own its patents and trademarks impugns the $6 million figure assigned to goodwill by Heupel. The burden shifted to Meritor to come forward with another value. The Court finds that there was insufficient evidence to rebut the Trustee's case. Moreover, the Court notes that its analysis is predicated for convenience on O'Day's ownership of the property. As has been established, O'Day did not obtain title to the real estate until months after the LBO. Accordingly, the $6 million and $4 million values attributable to the real estate by Meritor and Trustee, respectively, are suspect. Thus, the Trustee has demonstrated likelihood of success on the merits of Count II of his Verified Complaint.

### B. Sufficiency of Working Capital

According to the United States Court of Appeals for the First Circuit, "the basic purpose of § 5 is to 'prevent an undercapitalized company from being thrust into the market place to attract unwary creditors to inevitable losses.'" *Barrett v. Continental Illinois National Bank & Trust Co.*, 882 F.2d 1, 5 (1st Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990) (citations omitted). The court stated the following:

> [t]he proper application of § 5 requires a court to examine a company's capital throughout a reasonable period of time surrounding the precise date of a challenged transfer. This approach avoids the risk of ascribing undue weight to the state of a company's balance sheet on a particular day, and allows the court to make a realistic assessment of the impact of a transfer on a company's ability to conduct its affairs.
>
> \*　\*　\*　\*　\*　\*
>
> This approach appears to be essentially the one followed in Massachusetts. In *Widett v. George*, 336 Mass. 746, 148

N.E.2d 172 (1958), the Massachusetts Supreme Judicial Court held that the question concerning the adequacy of capital after the challenged transfer had to be 'judged prospectively' from the date of the transfer. 336 Mass. at 751, 148 N.E.2d 172. Under the *Widett* approach, a court begins its analysis with the transfer and then examines the relationship, if any, between the amount of capital remaining in the business in the period after the transfer and the business' ability to continue operations during that period in the same manner as it conducted them before the transfer. In our view, this is the most sensible construction of § 5.

*Barrett,* 882 F.2d at 4–5.

With respect to LBO's in particular, courts have employed different standards to determine whether capital was unreasonably small. *See, e.g., Kupetz v. Continental Illinois National Bank & Trust Co.,* 77 B.R. 754, 761–63 (C.D.Cal.1987), *aff'd, Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988) (essentially a solvency analysis); *Credit Managers Association of Southern California v. Federal Company,* 629 F.Supp. 175, 183–88 (C.D.Cal.1985) (cash flow analysis); *Wells Fargo Bank v. Desert View Building Supplies, Inc.,* 475 F.Supp. 693, 697 (D.Nev.1978), *aff'd,* 633 F.2d 221, 225 (9th Cir.1980) (working capital depletion); *Steph .v. Branch,* 255 F.Supp. 526, 532 (E.D.Okla.1966), *aff'd,* 389 F.2d 233 (10th Cir.1968) (capital depleted below a "reasonable level" although debtor not insolvent).

In perhaps the leading case on the issue of unreasonably small capital, the court concluded that its task in determining whether a company had sufficient working capital as evidenced by cash flow projections was not to examine what happened to the company but whether the projections employed prior to the LBO were prudent. *Credit Managers,* 629 F.Supp. at 187. The court emphasized that a decision should not be made using hindsight. In the *Credit Managers* case, the target company was affected by a number of adverse events after the LBO, including a two month strike, a loss of business due to the shut-

down of a large customer, and general slowdown in the economy. The court concluded that these events were not predictable, and the company could have achieved the sales levels predicted if it had not experienced these setbacks. *Id.*

Both the Trustee and Meritor cite the *Credit Managers* case and discuss the two sets of projections generated by Funston and Jones. Consequently, the reasonableness of the projections is critical to the Trustee's case under Count III. The reasonableness of the assumptions underlying these projections is significant in two respects. First, O'Day's ability to repay the loan facilities provided by Meritor was predicated upon the reasonableness of these projections. Second, O'Day's concomitant ability to continue as a successful manufacturer of boats was directly related to the feasibility of these projections.

One set of projections was generated upon the assumption that O'Day's projected EBIT would be two million dollars each year following the LBO. A second set of projections was generated assuming that O'Day would experience reduced sales, in which case O'Day would realize earnings before interest and taxes of $1.975 million with a 21.84% gross profit margin. According to the testimony of both Funston and Jones, the first set of projections represented the "most likely" post-LBO situation, whereas the latter set of projections were indicative of a "worst case" scenario. (Trans. Vol. II, p. 157; Trans. Vol. I, pp. 162–63). Under either set of projections, however, O'Day would be capable of servicing the loan facilities provided by Meritor.

The Trustee contends that the projections generated by Funston and Jones were "woefully deficient" because they failed to properly consider O'Day's historical data, as well as its most recent financial trends. That is, the Trustee maintains that EBIT and gross profit margin assumptions ignored historical averages and, more importantly, disregarded available fiscal 1987 results. The Trustee's expert, Voiland, presented testimony and exhibits which support the Trustee's position. (Tr. Ex. 51–55, 63).

The Bank, however, argues that the projections attached to the Credit Memo were eminently reasonable in light of O'Day's historical performance as well as the fiscal 1987 information available to Funston at the time he prepared them. In fact, Funston testified that the projections may have represented a conservative estimate of revenue. (Trans. Vol. II, p. 155). In support of the Bank's position, Meritor's expert, Heupel, presented exhibits which purported to justify these projections in light of O'Day's historical performance. (M. Ex. 88, 89). Heupel also testified that the projected figures were reasonable and conservative. (Trans. Vol. V, pp. 87–91).

Contrary to Meritor's position, the Court is persuaded that the projections generated by Jones and Funston were totally inconsistent with the historical figures contained in the Goldman Sachs' Offering Memo, as well as the fiscal 1987 data that was available to them. As stated above, both Funston and Jones testified that the reduced sales projection of $1,975,000 depicted the "worst case" scenario in terms of O'Day's future earnings. Despite this characterization, an EBIT assumption of $1,975,000 was well above the historical average that can be computed using the data presented in the Credit Memo. Taking the actual EBIT figures from the "Historical Financial Analysis" section of the Credit Memo, one can quickly compute a five year (1982–1986) average EBIT of $1,586,000. While the Bank contends that the inclusion of 1985 data distorts this computation, even if one were to exclude O'Day's 1985 EBIT of $554,000, the resulting four year average EBIT was merely $1,844,000 which is $131,-000 below Funston's "worst case" projection. The same point can be illustrated by comparing the projected gross profit margin with the historical margins contained in the above mentioned section of the Credit Memo. Even if one excludes 1985 profit margin data, O'Day's actual four year average gross profit margin was 19.62% while the reduced sales or "worst case" projected gross profit margin was 21.84%. Thus, contrary to the Bank's suggestion, it is clear that the projections did

not reflect O'Day's pre–1987 historical performance.

Furthermore, although Jones and Heupel testified that a corporation's most recent financial information is perhaps the most significant information that one looks to when conducting a due diligence investigation prior to a leveraged buy out, the fiscal 1987 data that was available to Jones and Funston at the time they produced the projections in question appears to have been given little weight. (Trans. Vol. I, p. 133; Trans. Vol. II, pp. 146–147; Trans. Vol. VI, pp. 76–77). Trustee's Exhibit 54 illustrates this point by juxtaposing the 1988 projected operating income and gross profit margin assumption figures found in Exhibit IV to the Credit Memo (M. Ex. 36) with O'Day's operating results, using the five year average gross profit margin, and the gross profit margins for the second and third quarter of the 1987 fiscal year, as well as the period ending with the eleventh month of the 1987 fiscal year. The figures presented in Exhibit 54 were readily available to Jones and Funston prior to the June 30, 1987 closing date. In fact, the second and third quarter results were available to them before they constructed the projections. For the six months ending December 31, 1986 (the first six months of O'Day's fiscal year 1987), O'Day's actual gross profit margin was 19.23%. This figure dropped to 18.87% at the end of the third quarter—March 31, 1987. Leaving aside the data that was available to Jones and Funston after the time they produced these projections, the deviation between the projected gross profit figures and the available fiscal 1987 data is irreconcilable.

In the same vein, Trustee's Exhibit 55, which juxtaposes the worst case income/cash flow projections with those obtained by utilizing the five year average gross profit margin, and the margins from the end of the sixth, ninth and eleventh month periods shows unequivocally that if lower gross margins were applied to the same sales projection, working capital needs could only be met by stretching accounts payable.

The reasonableness of the projections employed by Funston and Jones is further impugned by evidence that clearly established that they were well aware of the decrease in gross profit margin and consequent decline in EBIT prior to the LBO closing. Funston and Jones testified that they had received the third quarter performance information prepared by Deloitte Haskins & Sells and that they had discussed the earnings shortfalls with members of O'Day's management. (Trans. Vol. I, pp. 143–149; Trans. Vol. II, pp. 165–168). During the course of their conversations, both men were made aware of ongoing labor problems and unfavorable cost increases. Indeed, the effect of these problems was clearly and continuously spelled out in the monthly reports issued by O'Day's controller Victor Gonsalves. (Tr. Ex. 27–32). In the face of such unequivocal financial information, Jones and Funston projected that, in a *worst case scenario*, O'Day would somehow match or exceed its *best* financial performance of the 1980's.

Notwithstanding the unwarranted deviation between projected data and actual historical figures, Meritor cloaks itself with Exhibit 88 to support the contention that, excluding 1985 data, a reduced sales EBIT assumption of $1,975,000 is "extremely reasonable" in light of O'Day's performance *between 1983 and 1986.* This assertion fails to convince in two respects. First of all, the EBIT figures contained in the "Historical Financial Analysis" section of the Credit Memo included data from 1982, a year in which EBIT was $965,000. Given the fact that Jones and Funston prepared projections using the data contained in the Credit Memo, it is misleading to attempt to substantiate the projections by narrowing the frame of reference. Second, fiscal 1987 data that was available to Jones and Funston before they prepared these projections would have or should have indicated that O'Day would actually realize 1987 EBIT (ultimately determined to be $1,467,-000) substantially below its "worst case" projection of $1,975,000. Thus, it is disingenuous for the Bank's expert to omit 1982 figures, which, in the opinion of the Court, shed a great deal of light on the prudence

of the projections, given the cyclicality of the industry.

Similarly, Meritor attempts to further obscure the meaning of historical performance when it argues that a reduced sales EBIT projection of $1,975,000 is extremely reasonable, and indeed conservative, in view of O'Day's performance in *1984 and 1986*. It is illusory at best to justify a "worst case" projection by comparing it with two of O'Day's finest years of the decade in terms of earnings. It does not appear to be reasonable, much less conservative, to generate projections, that, in a "worst case" scenario, employ earnings assumptions that greatly exceed the actual average experienced over the period of reference. The Court finds, therefore, that the earnings assumptions upon which Jones and Funston based their projections were unreasonable and, as a result, the projections themselves were unreasonable.

Unlike the projections in the *Credit Managers* case, the projections employed by Funston and O'Day were imprudent. Although Meritor points to a variety of unpredictable, internal and external problems, such as poor management, bad marketing decisions, decline in the number of dealers and sales people, and the stock market crash of October 1987 as the causes of O'Day's dismal performance following the LBO (Trans. Vol. V, pp. 153–177; 186–197), the Court finds that labor problems, cost variances and cylicality in the industry were the major contributors to O'Day's fiscal woes and were manifest and readily predictable prior to the LBO. Thus, using the *Credit Managers* test outlined above, the Court concludes that O'Day was left with unreasonably small capital.

█ In ruling on the sufficiency of working capital under section 5 of the UFCA, the Court has not confined itself to an examination of the projections. The record is replete with other indicia of the company's insufficient capital to continue as a viable entity. It must be remembered that "[u]nreasonably small capitalization need not be so extreme a condition of financial debility as to constitute equitable insolvency, which is an inability to pay debts as they mature ... [and] ... unreasonably small capitalization encompasses financial difficulties which are short of equitable insolvency or bankruptcy insolvency but are likely to lead to some type of insolvency eventually." Queenan, *supra*, at 18.

The Court has considered the following financial difficulties experienced by O'Day within the fiscal year following the LBO. In the first place, Arthur Andersen's audited financials show a net decrease in working capital of $8,525,603, as well as a net loss of $222,620. In this regard, working capital, as has been stated, is defined as the excess of current assets over current liabilities. (Trans. Vol. I, pp. 112–113). Current assets are cash or items that can be converted into cash within one year; current liabilities are obligations which come due within one year. Arthur Andersen's determination that net working capital decreased by over $8 million is directly attributable to O'Day's defaults under its loan agreement. However, an examination of the accounts payable and the number of days those accounts remained outstanding during fiscal year 1988 shows that the net working capital decrease was also attributable to the increased level of accounts payable. (Trans. Vol. III, pp. 54–56). Clearly, the 45 day payable stretch anticipated by Funston and Jones in their projections was a fiction after September of 1987. In short, O'Day was not paying its trade debt as it came due, particularly given the testimony establishing that most payment terms were net 30 days.

As a rule-of-thumb, a ratio of current assets to current liabilities of 2:1 is satisfactory, although ratios vary from business to business. One author has stated that:

> [w]hen the current ratio for a commercial enterprise (as distinguished from a public utility that has captive customers) falls below 2:1, there is a good chance that the business will have difficulty making current liability payments. Also, such a company would be hard pressed to expand without borrowing. If, for example, the current ratio is only 1:1, the payment of current liabilities must await

the collection of accounts receivable and the sale of inventory.

E. Faris, *Accounting for Lawyers*, 270 (4th ed. 1982).

Information contained in the Credit Memo (M. Ex. 36) and the Offering Memo (M. Ex. 1) shows the ratio of current assets to current liabilities to be 1.45:1 at fiscal year end 1985 and 1.74:1 at fiscal year end 1986. As of December 31, 1986, the ratio can be calculated to be 2.42:1. However, a negative ratio of .69:1 can be computed from the actual opening day balance sheet constructed by Voiland from the Arthur Andersen work papers. Notably, that balance sheet includes the amount outstanding on the revolver as a current liability. After the LBO, the so-called current ratios can be computed from the balance sheets Gonsalves attached to his monthly Controller's Letters. Although these balance sheets are unaudited, they reflect that at no time after the LBO did the current ratio exceed 1.50:1, and, if the revolver is included as a current liability, the ratio is less than 1:1.

Given the ratios computed by the Court, it's not surprising that O'Day's management was concerned about its cash needs. Because of the interest and principal payments due Meritor, as well as current expenses, O'Day obtained in December of 1986 a $500,000 infusion of capital from 3I, which, according to Gonsalves, was used to lower payables and fund payments to the Bank.

In May and June of 1988, O'Day's financial condition prompted a formal request of Meritor to restructure the DIAL loan. Additionally, the Board of Directors considered ways of developing more working capital, including the sale of five acres of excess land and the refinancing of the long term debt. During this general period of time, O'Day defaulted under its loan covenants with Meritor, and Meritor, which was always concerned about its collateral shortfall, proposed a "short term fix" for O'Day. It is important to bear in mind that O'Day's working capital needs remained unsatisfied, despite the receipt of the Clawback and proceeds from the sale of Prindle since these funds were used to pay Bank debt.

Although Meritor emphasizes that the company had significant sums available to it under the revolver (the availability under the revolver, which in actuality fluctuated on a daily basis, averaged $365,000 per month, ranging from a high of $1,050,000 to a low of $75,000 (M. Ex. 96)) and managed to stay in business for 22 months after the LBO, the Court is not persuaded that such evidence establishes the adequacy of working capital. Common sense dictates that an ability to borrow is not a substitute for operating profits. Moreover, the concerns expressed by management and Bank personnel belies the Bank's present position. Indeed, Voiland testified that if vendors had been paid currently after the LBO when the company was entering its period of projected negative cash flow, the availability under the revolver would have been reduced to zero in September. (Trans. Vol. III, pp. 31–34; Tr. Ex. 58). Finally, O'Day's financial position was virtually hopeless after June 30, 1988. Without debt restructuring, the borrowing of $650,000 in December, 1988 could not and did not aid the company. From July of 1988 to February of 1989 when Gonsalves apparently stopped preparing Controller's Letters, the days payable outstanding doubled from 70 to an alarming 140.

To the extent Meritor relies on Arthur Andersen's failure to include a going concern qualification in its fiscal year end 1988 audit, the Court is mindful of Heupel's cautionary advice to lenders contained in an article he co-authored:

Even though the auditor's role and opinion statements have been dramatically changed, they have restrictions and limitations that must be viewed realistically in evaluating their early warning capabilities. Auditors are working with financial statements prepared by management, and their only responsibility in assessing a company's ability to continue as a going concern is to evaluate *whether there is substantial doubt about the entity's ability to continue.*

Unfortunately then, the lender can only rely on auditor opinions and management statements for clues. The responsibility for catching emerging problems early on still rests on the shoulders of the lender.

(Tr. Ex. 62 (emphasis supplied)). In view of this warning, the Court cannot help but agree with Voiland's criticism of Arthur Andersen's clean audit report, specifically management's representations about refinancing simply were taken at face value without evidence of commitments on the part of new lenders. (Trans. Vol. III, p. 49). The Arthur Andersen work papers (Tr. Ex. 46) reveal that Arthur Andersen recognized O'Day's heavy debt burden, operating losses, forecasted negative cash flows and need for additional financing. The accounting firm, however, chose to give more weight to management representations about the company's future performance—ability to obtain new financing, cut costs, and implement new marketing strategies—than to the company's existing financial condition. For these reasons, the Court cannot accept the audit report as conclusive evidence of either solvency or sufficiency of working capital, particularly where it shows a net decrease in working capital of $8,525,603 in the Statement of Changes in Financial Position. (M. Ex. 42). Thus, the Court finds that the Trustee has established a likelihood of success on the merits with respect to Count III of his Verified Complaint.

## VII. THE JUNE 16, 1988 MORTGAGE

The Trustee argues that the June 16, 1988 mortgage is independently voidable as a fraudulent conveyance under the UFCA and Section 548 of the Bankruptcy Code. In support of his claim, the Trustee emphasizes the Debtor's financial difficulties at the time the mortgage was recorded.

Meritor defends the validity of the mortgage citing *Matter of Abraham,* 33 B.R. 963 (Bankr.M.D.Fla.1983). In that case the court stated:

It is well established that the existence of a preexisting debt precludes the finding that a transfer is fraudulent under [§ 548] provided, of course, that the value of the additional consideration represents a fair and adequate consideration ... Accordingly, when a property is transferred or an obligation is incurred for the purpose of security it is only necessary that its value not be disproportionately large as compared with the amount of the advance of a debt secured.

*Id.* at 969. Meritor also relies on *Telefest, Inc. v. VU-TV, Inc.,* 591 F.Supp. 1368 (D.N.J.1984), a case in which the court stated that "[w]here a conveyance is supported by an antecedent debt, a grantee of that conveyance may support it when it is attacked as fraudulent merely by pointing to the antecedent debt as the consideration, provided the grantee acted in good faith in accepting it." *Id.* at 1377. Meritor emphasizes the parties' constant intention to grant Meritor a mortgage on the real estate, adding that the recordation of the mortgage within a year of filing does not make the transfer fraudulent in and of itself.

■■ The Court agrees with the Trustee's observation that Meritor's argument, not surprisingly, ignores the nature of the antecedent debt and the lack of fair consideration involved in securing it. The Court has ruled that the Trustee is likely to succeed on the merits of his claim that O'Day did not receive fair consideration in exchange for the security interests transferred in June of 1987. Consequently, it would be inconsistent for the Court to rule that the very debt incurred by O'Day in conjunction with the LBO constituted value for purposes of section 548(d)(2) of the Bankruptcy Code after the transaction. This Court agrees with the court in *In re Kelley,* 7 B.R. 384 (Bankr.D.S.D.1980). In that case, the court indicated the following:

Under 11 U.S.C. Section 548(d)(2)(A), value can be the securing of a present or an antecedent debt of the debtor. This Court holds that where the granting of a security interest by a debtor in his property occurs contemporaneously with the creditor giving the debtor a reasonably equivalent value for the security interest, no fraudulent transfer under Section 548(a)(2) exists when the creditor perfects that security interest at a later date

that is within one year of the filing of the debtor's bankruptcy petition. However, where the debtor incurs a debt to creditor, then at a later date grants that creditor a security interest in his property without receiving any new consideration, a fraudulent transfer under Section 548(a)(2) has occurred if that creditor perfects the security interest within one year from the date of the filing of the bankruptcy, assuming all the other elements exist.

*Id.* at 388–89. In June of 1988, O'Day was suffering the ill effects of insufficient working capital and Meritor was fully aware of O'Day's financial condition and its own collateral shortfall. Thus, the Court finds that the Trustee has demonstrated a liklihood on the merits of Count V to the extent that the June 18, 1988 conveyance must be set aside except to the extent of the $1,384,734.42 outstanding on the revolver as of the filing date. The Court's examination of the loan transaction summary (Tr. Ex. 25) reveals that the amount of money advanced under the revolver that was used to fund the acquisition (i.e., $1,871,411.10) was repaid prior to June 16, 1988. Thus, the amount outstanding as of the filing date (i.e., $1,384,734.42) was in fact legitimate antecedent debt untainted by the lack of consideration affecting the June 30, 1987 transaction and the $1.87 million advance under the revolver to fund the acquisition. Therefore, the mortgage of June 18, 1988 secures that amount.[10]

## VIII. INTENTIONAL FRAUD

Through Count I of his complaint, the Trustee has asserted a claim under section 7 of the UFCA. The Trustee's argument in support of this claim focuses on the stretching of accounts payable post-LBO. Specifically, the Trustee contends that the working capital shrinkage provision found in the Bank's Credit Memo envisioned the repayment of LBO debt by the stretch of O'Day's accounts payable. Stated more simply, the Trustee argues that the plan of repayment anticipated by Meritor required O'Day to delay paying unsecured creditors,

using the funds withheld to pay Meritor instead. Because the projections attached to the Credit Memorandum indicate that this payable stretch would continue throughout the repayment period, the Trustee maintains that this constitutes clear evidence of the Bank's intention to delay and hinder unsecured creditors.

The Bank, in response, asserts that there is considerable evidence in the record establishing that a substantial amount of time and money had been invested in the O'Day LBO by Meritor, members of O'Day's management, Funston and others. Given the significance of these investments, the Bank contends that a claim of actual intent to delay, hinder or defraud "makes no logical sense."

▮▮▮▮ Although the issue has not previously been addressed in this jurisdiction, this Court concludes that in order to succeed on a claim raised pursuant to section 7 of the UFCA the plaintiff bears the burden of proving actual intent by clear and convincing evidence. *United States v. Gleneagles Investment Co., Inc.*, 565 F.Supp. 556, 580 (M.D.Pa.1983), *aff'd sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3rd Cir.1986), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *In re Bidlofsky*, 57 B.R. 883 (Bankr.E.D.Mich.1985). Viewing the evidence through the lens of the clear and convincing standard, the Court cannot find that the Trustee has proven that the Bank actually intended to hinder, delay or defraud present or future creditors as defined by the statute. Even if a preponderance of the evidence standard is adopted, the Trustee fails on the claim of actual intent. At best, the evidence on this issue is equivocal.

Without engaging in an extended review of *Gleneagles* vis-a-vis the instant case, it is sufficient to note that *Gleneagles* involved an egregious factual scenario that, at least with respect to the issue of actual intent, bears little relation to the facts of this case. As in the present case, one of

---

**10.** To the extent that the Court has resolved the issue posed by the 1988 mortgage under Count V, a discussion of the same issue under the UFCA (Count IV) is unwarranted.

the primary parties in *Gleneagles*, Raymond Colliery, Inc., had been the subject of a leveraged buy out, and, as in the instant case, Raymond Colliery, Inc. subsequently ceased operations. However, unlike the case at bar, Raymond Colliery, Inc. was in a desperate financial condition immediately prior to the leveraged transaction. Indeed, the District Court observed that "[i]f the parties could have foreseen the effect on creditors resulting from the assumption of the IIT obligation by the Raymond Group, *a company in a serious financial condition*, the parties must be deemed to have intended the same." *Gleneagles*, 565 F.Supp. at 581 (emphasis added).

At no time during the course of this case has the Trustee even suggested that the company was anything but healthy prior to the 1987 LBO. This distinction alone provides a sufficient reason for this Court to reject an application of the ruling in *Gleneagles* to the facts of this case.

Beside the language employed by Jones in the Credit Memorandum and the inferences that can be drawn from Gonsalves testimony and his post-LBO letter to vendors, the Trustee has presented no additional evidence that would suggest that the Bank actually intended to hinder, delay or defraud creditors of O'Day through the stretch of payables or otherwise. The Court is convinced that, at the outset, the parties involved in the transaction, fully intended to maintain and perhaps to increase the boatmaker's ability to satisfy its obligations to unsecured creditors. Nevertheless, after the LBO, Meritor contemplated that the accounts payable stretch envisioned in the Credit Memo would be permanent and was continuously seeking ways to reduce its collateral shortfall and improve its own position. While these acts may constitute grounds for equitable subordination, they do not rise to the level of actual fraud. Therefore, the Trustee has failed to prove a likelihood of success on the merits with respect to his claim of actual fraud.

## IX. EQUITABLE SUBORDINATION

The fraudulent conveyance action before the Court raises an issue pertaining to subordination: does a determination that Meritor's liens are avoidable as fraudulent conveyances leave Meritor with a general unsecured claim. The Trustee, on the one hand, contends that a creditor or creditors who successfully invoke the provisions of sections 4, 5 or 7 of the UFCA or section 548 of the Bankruptcy Code are entitled to be satisfied, in full, prior to any recovery by the fraudulent transferee. The Trustee further asserts that it would be anomalous for the Court to permit the avoidance of liens under the UFCA or section 548 and then allow the available recovery to injured O'Day creditors to be reduced by permitting Meritor to participate in that recovery as an unsecured creditor.

On the other hand, Meritor insists that there is simply no authority for the Trustee's position. In fact, Meritor contends that, should the Court sustain the Trustee's fraudulent conveyance action, it would remain as an unsecured creditor. Consequently, the Bank takes the position that, as a creditor of the estate with a proof of claim on file, it is entitled to its *pro rata* distribution of the estate's assets unless an objection to Meritor's proof of claim is filed and sustained by the Court or, alternatively, its claim is equitably subordinated under section 510 of the Bankruptcy Code. The Court disagrees. The language of the UFCA and the Bankruptcy Code supports the position taken by the Trustee.

Section 9 of the UFCA provides in relevant part:

(1) Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser—

(a) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim....

Mass.Gen.Laws Ann. ch. 109A, § 9 (West 1990). Similarly, under the Bankruptcy Code the Trustee, pursuant to sections 548 and 551, may avoid liens, and the liens

avoided are automatically "preserved for the benefit of the estate but only with respect to property of the estate." 11 U.S.C. § 551.

Assuming arguendo that Meritor's position is correct, equitable subordination is an equitable remedy available to the Trustee. However, bankruptcy courts have not treated subordination questions with great consistency. Nevertheless, in a recent decision, *In re New Commonwealth Publishing Company, Inc.*, 118 B.R. 155 (Bankr.D.Mass.1990), this Court set forth a three-prong test for determining the propriety of equitable subordination:

> (1) whether the claimant engaged in inequitable conduct, (2) whether that conduct resulted in injury to other creditors, and (3) whether subordination would be consistent with other provisions of the Bankruptcy Code.

*Id.* at 165. *See, e.g., In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1282 (8th Cir. 1988); *Matter of Missionary Baptist Foundation of America, Inc.*, 712 F.2d 206 (5th Cir.1983).

The Trustee points to four actions by Meritor to justify equitable subordination:

> 1. Creating cash to meet *its* debt payments by *ordering* the cessation of third-party vendor payments post-LBO (Tr. Ex. 36);
>
> 2. Demanding that the IRB to be paid off at a time when the Company could least afford it, requiring an additional stretch of third-party accounts payable (Trans. Vol. II, p. 88);
>
> 3. Demanding and receiving otherwise unrequired principal *pre*payments under its term loan to reduce an acknowledged collateral shortfall in the amount of $2.7 million; and
>
> 4. Recording a $10.6 million Mortgage in its favor on June 16, 1988, a time when the Company was not only insolvent, but clearly lacked sufficient working capital on a going-forward basis.

While the Trustee's characterization of the Bank's conduct may be somewhat overstated, the Court is persuaded that Meritor's post-LBO conduct was tantamount to overreaching, although the Court believes that Meritor did not act to intentionally hinder, delay or defraud creditors, at the very outset of its relationship with O'Day. The Court finds that the Bank and Funston suffered from an overweening optimism about the Debtor's financial abilities, and their own, which addled their ability to evaluate the company in light of its financial condition in the month's prior to the LBO, and permitted them to disregard the cyclical nature of the Debtor's business and the industry. The projections prepared by the Bank had no cushion, no room for error. Nevertheless, the Bank approved the loan facilities requested by Funston despite a collateral shortfall. Indeed, the Bank proceeded to close the loan, even though the company did not own assets that comprised a significant portion of the collateral it sought. When the Bank's prognostications failed to materialize due to foreseeable problems, the Bank set out on a course to improve its own position to the serious detriment of the unsecured creditors. Thus, the Court finds that, even if authority exists to permit Meritor to share in the Debtor's estate as a general unsecured creditor, the Trustee has demonstrated the existence of sufficient grounds to subordinate the Bank's claim pursuant to section 510 of the Bankruptcy Code. *See In re Slefco*, 107 B.R. 628 (Bankr.E.D. Ark.1989); *In re Dakota Country Store Foods, Inc.*, 107 B.R. 977 (Bankr.D.S.D. 1989).

## X. CONCLUSION

The sole issue before the Court has been whether the Trustee has demonstrated a likelihood of success on the merits with respect to his Verified Complaint. With respect to Counts II, III, V and VI, the Court finds that the Trustee has demonstrated a likelihood of success on the merits. Accordingly, the Court hereby denies Meritor's Amended Motion for Relief from Stay and allows the Trustee's Motion for a Permanent Injunction.

In view of the fact that trial counsel "held no punches" and that a trial on the merits of the Trustee's complaint would be no more than a repetition of what has

already transpired, as well as a preposterous waste of judicial resources, and, in accordance with the findings made in section VI of this opinion and pursuant to sections 5 and 9 of the UFCA, the Court rules that the liens and security interests obtained by Meritor on June 30, 1987 are void to the extent necessary to satisfy unsecured claims. The Court further rules that the conveyance of a mortgage on June 16, 1988, except as set forth in section VII of this opinion is void. The Court specifically does not rule that the obligations incurred by O'Day as of June 30, 1987 are annulled. Accordingly, Meritor is not ordered to disgorge payments it received after the LBO. To the extent that a possible ambiguity or inconsistency is created by this ruling with respect to the June 16, 1988 mortgage vis-a-vis the definition of value (i.e., the securing of an antecedent debt) and, to the extent necessary to avoid that result, as well as for the reasons set forth in section IX of this opinion, the Court equitably subordinates all of Meritor's claim pursuant to Section 510(c)(2) of the Bankruptcy Code, to the extent the claim is in excess of $1,384,734.42 secured by that mortgage.

Accordingly, the Court enters judgment in favor of the Trustee on Counts II, III, V, except in the amount of $1,384,734.42, and VI of his Complaint and against Meritor. The Court enters judgment in favor of Meritor on Count I, and Count V in the amount of $1,384,734.42, and against the Trustee. In view of the Court's rulings, no action is necessary with respect to Count IV.